*Attorney Grievance Commission of Maryland v. Landon Maurice White*, Misc. Docket AG No. 7, September Term, 2021. Opinion by Eaves, J.

**ATTORNEY DISCIPLINE — SANCTION — DISBARMENT**

Respondent, Landon Maurice White, violated several provisions of the Maryland Attorneys' Rules of Professional Conduct ("MARPC") when he failed to communicate with clients; refused to refund client funds; made intentional misrepresentations to various courts and Petitioner, the Attorney Grievance Commission of Maryland; failed to cooperate with Petitioner during the investigatory process; and mismanaged client funds in a variety of ways.

Respondent's conduct violated the following MARPC: 1.1 (Competence); 1.2 (Scope of Representation and Allocation of Authority Between Client and Lawyer); 1.3 (Diligence); 1.4 (Communication); 1.5 (Fees); 1.8 (Conflict of Interest; Current Clients; Specific Rules); 1.15 (Safekeeping Property); 1.16 (Declining or Terminating Representation); 3.1 (Meritorious Claims and Contentions); 3.3 (Candor Toward the Tribunal); 8.1 (Bar Admission and Disciplinary Matters); 8.4 (Misconduct); and Maryland Rules 19-407 (Attorney Trust Account Record-Keeping) and 19-410 (Prohibited Transactions). These violations warrant disbarment.

IN THE COURT OF APPEALS
OF MARYLAND

Misc. Docket AG No. 7

September Term, 2021

---

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

LANDON MAURICE WHITE

---

Fader, C.J.
Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

---

Opinion by Eaves, J.

---

Filed: August 12, 2022

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Landon Maurice White, Respondent, a member of the Bar of the Court of Appeals of Maryland, maintained a solo practice in Baltimore. On May 24, 2021, Petitioner, the Attorney Grievance Commission of Maryland, acting through Bar Counsel, filed a Petition for Disciplinary or Remedial Action ("Petition") in this Court, alleging that Respondent violated the following 13 Maryland Attorneys' Rules of Professional Conduct ("MARPC") and two Maryland Rules regarding attorney trust accounts:

1. 19-301.1 (Competence) (1.1);

2. 19-301.2 (Scope of Representation and Allocation of Authority Between Client and Lawyer) (1.2);

3. 19-301.3 (Diligence) (1.3);

4. 19-301.4 (Communication) (1.4);

5. 19-301.5 (Fees) (1.5);

6. 19-301.8 (Conflict of Interest; Current Clients; Specific Rules) (1.8);

7. 19-301.15 (Safekeeping of Property) (1.15);

8. 19-301.16 (Declining or Terminating Representation) (1.16);

9. 19-303.1 (Meritorious Claims and Contentions) (3.1);

10. 19-303.3 (Candor Toward the Tribunal) (3.3);

11. 19-303.4 (Fairness to Opposing Party and Attorney) (3.4);

12. 19-308.1 (Bar Admissions and disciplinary Matters) (8.1);

13. 19-308.4 (Misconduct) (8.4);

14. 19-407 (Attorney Trust Account Record-Keeping); and

15. 19-410 (Prohibited Transactions).

Pursuant to Maryland Rule 19-772(a), this Court referred the matter to the Circuit Court for Baltimore City and designated the Honorable Myshala E. Middleton (the "hearing judge") to conduct an evidentiary hearing and provide findings of fact and conclusions of law. After a three-day hearing held on January 4, January 19, and February 1, 2022, the hearing judge found clear and convincing evidence that Respondent violated 14 of the 15 allegations in the Petition.[1] Respondent filed exceptions to the hearing judge's Findings of Fact and Conclusions of Law, and this Court heard oral arguments on June 2, 2022.

On June 6, 2022, we issued a *per curiam* Order imposing the sanction of immediate disbarment of Respondent from the practice of law. *Att'y Grievance Comm'n v. White*, 479 Md. 83 (2022). We now overrule the exceptions and hold that the hearing judge's Findings of Fact and Conclusions of Law are supported by clear and convincing evidence. Our reasons are as follows.

## I.     FINDINGS OF FACT

The hearing judge found the following facts, which we summarize.

### *A.  Background*

Respondent was admitted to the Bar of the Court of Appeals of Maryland on June 16, 2015, and maintained a solo practice of law in Baltimore, Maryland. On September 9, 2019, Petitioner and Respondent entered into a Conditional Diversion Agreement ("CDA")

---

[1] At the conclusion of the trial, Petitioner withdrew the Rule 3.4 charge.

and an Agreement Concerning the Appointment of a Law Practice Monitor.[2] These agreements related to Respondent's representation of Orlando Hamilton and Don Crudup. Along with these clients' cases, however, the allegations in the Petition also concern three other clients' cases (Robert Frazier, Kenneth Cole, and the Nelson Contracting Company) and Respondent's attorney trust account.

## B. Representation of Orlando Hamilton

In 1986, Orlando Hamilton was convicted of first-degree murder in the Circuit Court for Prince George's County and received a life sentence.[3] On September 9, 2017, Mr. Hamilton's mother, Mary Hamilton, retained Respondent to file a Petition for Post-Conviction Relief, for which she agreed to a flat fee of $8,000.00 and provided a cashier's check for $4,500.00. Neither Mr. Hamilton nor his mother signed a retainer agreement with Respondent.

After several months of unsuccessful attempts to contact Respondent both by telephone and in person, Mary Hamilton terminated Respondent's services and requested a refund. Instead of immediately refunding Ms. Hamilton, Respondent wrote to Mr. Hamilton to inquire if he wished Respondent to continue representation. Even though Mr.

---

[2] The CDA required Respondent to refrain from representing any clients in post-conviction cases for one year, attend six continuing legal education programs, attend the program on attorney trust account management offered by Petitioner, execute written retainer agreements with all clients, and obtain professional liability insurance to be maintained for the duration of the CDA.

[3] We mean no disrespect in mentioning the nature of the convictions and sentences of Mr. Hamilton or any other clients that are cited in this Opinion. We do so only to illustrate the seriousness of the reasons for which they retained Respondent.

Hamilton did not respond to the letter, Respondent drafted a Petition for Post-Conviction Relief. Mary Hamilton filed a complaint with Petitioner, following which Respondent fully refunded her via two checks.

Petitioner docketed on June 22, 2018, the Hamilton complaint and requested that Respondent provide a copy of Mr. Hamilton's client file, a copy of any financial record-keeping pursuant to Maryland Rule 19-407, and an explanation of whether he provided Mary Hamilton with an accounting of the legal services he performed. Instead of complying with this request, Respondent advised Petitioner that he refunded Mary Hamilton in full and that he would also provide the information requested. After three more requests from Petitioner that also went unanswered,[4] Respondent provided a written response.

### C. Representation of Don Crudup

In October 2016, Don Crudup filed a pro se complaint in the United States District Court for the District of Maryland, alleging negligence by employees of the institution where he is incarcerated—Eastern Correctional Institution. In response to the defendants' motions to dismiss, Mr. Crudup retained Respondent to represent him and signed a retainer agreement, which provided for a fee on a contingency basis, whereby Respondent would receive 40% of any settlement proceeds awarded. On May 26, 2017, Respondent entered his appearance and sought an extension to file a response to the defendants' motions. The district court granted the request and set a deadline for responses to be filed no later than

---

[4] The hearing judge found that Respondent did not respond to Petitioner's July 23, 2018, August 22, 2018, and September 26, 2018 requests.

4

July 27, 2017. After a review of the pending motions, however, Respondent determined that Mr. Crudup had failed to exhaust his administrative remedies before the complaint was filed,[5] and Respondent advised Mr. Crudup to pursue the administrative remedies before he (Respondent) took any further action in the case. In turn, Mr. Crudup advised Respondent that he no longer wished to pursue the federal complaint. Respondent, however, did not take any action to dismiss the case or to withdraw his appearance. On September 25, 2017, the district court dismissed Mr. Crudup's complaint.

On April 23, 2018, Mr. Crudup filed a complaint with Petitioner. In a July 20, 2018, letter, Petitioner asked Respondent to provide a complete copy of Mr. Crudup's client file. Respondent ignored that request, as well as two subsequent requests. Respondent finally provided in October 2018 a copy of Mr. Crudup's client file.

On July 2, 2019, Petitioner took Respondent's statement under oath, during which Respondent admitted that he periodically failed to provide written retainer agreements and settlement disbursement sheets to clients in contingency cases.

### D. Representation of Robert Frazier

Robert Frazier was convicted on October 25, 1988, of first-degree murder in the Circuit Court for Baltimore City and was sentenced on December 12, 1988, to life imprisonment without the possibility of parole. On July 28, 2016, Mr. Frazier, in proper person, filed a Petition for Writ of Actual Innocence and Request for Hearing in the Circuit

---

[5] One of Respondent's character witnesses, Russell Neverdon, who is discussed in more detail below, *see infra* Part VI, testified that he informed Respondent about the exhaustion requirement in administrative appeals.

Court for Baltimore City to which the State filed a response. The circuit court scheduled a hearing on the matter for December 16, 2016.

Mr. Frazier's son, Robert Johnson, retained Respondent to represent Mr. Frazier in the above matter and paid Respondent a flat fee of $4,000.00 in cash. Respondent neither deposited nor maintained the funds in an attorney trust account, as required by Maryland Rule 19-407(a), and Respondent did not obtain written, informed consent to deposit the funds in a non-attorney trust account. Respondent entered his appearance on behalf of Mr. Frazier and was successful in obtaining a postponement of the hearing.

Although the court rescheduled the hearing to March 8, 2017, between December 14, 2016, and March 8, 2017, Respondent did not communicate with Mr. Frazier or prepare Mr. Frazier for the hearing. Respondent also produced no evidence that he had any communication or visitation with Mr. Frazier prior to the March 8th hearing. In short, Respondent did no substantive work in preparation for the hearing, and, as a result, both Respondent and Mr. Frazier were unprepared. The court denied the petition, issued an opinion, and entered an order denying the Writ on February 9, 2018. Respondent neither advised Mr. Frazier of the court's decision nor provided him with a copy of the opinion.

Like his pre-hearing preparation, Respondent's post-hearing actions also were lacking in the following respects: (1) Respondent filed an untimely Notice of Appeal to the Court of Special Appeals without notifying Mr. Frazier and without paying a filing fee; (2) the appeals clerk's emails to Respondent on March 26, March 30, and April 6, 2018, and multiple telephone calls on April 10, 2018, regarding the outstanding filing fee went

unanswered[6]; and (3) Respondent's check for $121.00 mailed to the Clerk's Office was written from Respondent's attorney trust account, despite the fact that the funds provided by Mr. Frazier had been deposited into a different, non-attorney account.

Although the appeal was docketed in the Court of Special Appeals, which issued a Session Briefing Notice including the schedule for briefs and oral argument, Respondent advised neither Mr. Frazier nor Mr. Johnson of the Session Briefing Notice and schedule, did not prepare or file an appellate brief, and did not request additional fees from Mr. Frazier or his son to file an appellate brief.

Respondent eventually filed a Motion for Extension of Time to File Brief, claiming that his paralegal had "lost or misplaced the flash drive containing the completed copy of the brief." While this statement was a knowing and intentional misrepresentation, the Court of Special Appeals granted Respondent's motion and required the appellant's brief to be filed by November 1, 2018. Even with the additional four months, Respondent did not file a brief on behalf of Mr. Frazier, and, on January 22, 2019, pursuant to Maryland Rule 8-602(c)(5), the Court of Special Appeals dismissed Mr. Frazier's appeal for failure to file a brief. Respondent did not advise Mr. Frazier or Mr. Johnson that he failed to file the brief or that the appeal had been dismissed.

Instead, one month later, Respondent filed a Motion to Extend the Time to File a Motion for Reconsideration of the Court's Decision to Dismiss the Appellant's Appeal.

---

[6] With respect to the telephone calls on April 10, 2018, Respondent's voicemail inbox was full, and the Clerk's Office was unable to leave any messages regarding the filing fee.

7

Pursuant to Maryland Rule 8-602(e)(1), however, a motion for reconsideration must be filed no later than 10 days after the order of dismissal.[7] Respondent's motion was filed 31 days after the court's dismissal. In addition, although Respondent's last contact with Mr. Frazier was March 8, 2017, Respondent stated in that motion that he had "set up a meeting with Appellant's family member, but the meeting never took place." Respondent further stated in the motion that, "[u]ntil recently, [he] has not received any communication from the Appellant in this case or fees or costs associated with appeal." The hearing judge found that these statements were knowingly and intentionally false.

When Mr. Johnson learned of the circuit court's opinion, he contacted Respondent and scheduled a meeting for April 6, 2019. It was then that Respondent informed Mr. Johnson that in February 2018, the circuit court had denied Mr. Frazier's Writ of Actual Innocence. Respondent, however, lied to Mr. Johnson about Respondent's failure to file a brief, which led to the Court of Special Appeals' dismissal of Mr. Frazier's appeal. Instead, Respondent led Mr. Johnson to believe that Mr. Frazier had until April 15, 2019, to file a direct appeal to the Court of Special Appeals, and Respondent offered to handle the appeal if Mr. Johnson paid an additional fee; Mr. Johnson replied that he could not afford to pay an additional fee.

After his meeting with Mr. Johnson, Respondent received a telephone call from Mr. Frazier, during which he lied to Mr. Frazier about work he had performed on the appeal,

---

[7] Prior to the April 1, 2022, amendment of Maryland Rule 8-602, section (e) was amended in a February 9, 2022, Order, which changed the deadline of this rule for a motion for reconsideration from 10 days to 20 days after the entry of an order dismissing an appeal.

promising to send to Mr. Frazier a copy of the circuit court opinion and the appellate brief. As with Mr. Johnson, Respondent also did not inform Mr. Frazier of the dismissed appeal due to Respondent's failure to file a brief. Respondent did not provide Mr. Frazier with any documents relating to the appeal.

The Court of Special Appeals denied as untimely Respondent's Motion to Extend the Time to File a Motion for Reconsideration of the Court's Decision to Dismiss the Appellant's Appeal; the mandate was issued by the Clerk on April 11, 2019. Respondent did not advise Mr. Frazier or Mr. Johnson of the court's decision.

On September 12, 2019, Mr. Frazier filed a complaint against Respondent with Petitioner. Petitioner sent two written requests to Respondent, seeking a written response to the complaint. Respondent replied on October 18, 2019, stating, "I represented Mr. Frazier in circuit court in front of Judge Peters. I was never paid to do his appeal." The hearing judge found that this statement was intentionally misleading given that by this time an appeal had been filed but dismissed due to Respondent's actions (or lack thereof).

Petitioner emailed and mailed a letter to Respondent, requesting a more detailed response to Mr. Frazier's complaint and asked that a copy of Mr. Frazier's client file be provided no later than November 4, 2019. Yet, in his untimely letter dated November 8, 2019, Respondent again misleadingly stated that he had not been retained or paid to handle Mr. Frazier's appeal and that he had informed Mr. Johnson to contact the Office of the Public Defender ("OPD") to assist with the appeal. Before the hearing judge, Respondent stated that, after the appeal was dismissed, he advised Mr. Johnson to contact the OPD to

9

assist Mr. Frazier in refiling the Writ of Actual Innocence. Respondent did not provide a copy of Mr. Frazier's client file to Petitioner as requested.

Petitioner requested information regarding Respondent's communications with Mr. Frazier and again requested a copy of Mr. Frazier's client file to be provided no later than March 30, 2020. By letter dated April 13, 2020, Respondent falsely stated that he agreed to file an appeal on Mr. Frazier's behalf on the condition that he be paid. Respondent also stated that he filed the notice of appeal to preserve Mr. Frazier's right to appeal. Again, however, Respondent did not provide a copy of Mr. Frazier's client file.

### E. Representation of Kenneth Cole

In February 1992, Kenneth Cole was convicted in the Circuit Court for Howard County of first-degree rape, burglary, and other charges and was sentenced to life in prison in April 1992. He filed a Petition for Post-Conviction Relief, in proper person, in January 1994, which the circuit court denied in May that same year.

Mr. Cole retained Respondent on December 10, 2016, through Mr. Cole's brother-in-law, Richard Henson. On Mr. Cole's behalf, Mr. Henson paid Respondent a flat fee of $4,000.00 in cash for assistance with additional post-conviction proceedings. Respondent did not deposit or maintain the funds in an attorney trust account and did not receive written, informed consent to deposit the funds into a non-attorney trust account. Mr. Cole

10

sought to file either a second petition for post-conviction relief or, in the alternative, a motion to re-open his closed post-conviction, and to argue the case in court.[8]

Although Respondent visited Mr. Cole in prison on multiple occasions between December 2016 and June 2019, Respondent was unprepared to discuss Mr. Cole's case on each occasion and did not take any meaningful, substantive action on Mr. Cole's behalf during that timeframe: he neither filed a supplemental petition nor a motion to re-open. He further failed to explain to Mr. Cole why he did not file anything on his behalf.

On June 24, 2019, Mr. Cole sent Respondent a letter terminating Respondent's services and requesting a full ($4,000.00) refund. Respondent did not provide Mr. Cole with a refund, and, instead, Respondent requested Mr. Cole's trial transcripts to continue representation for the post-conviction matter. In a letter dated September 25, 2019, Mr. Cole requested Respondent return the original transcripts and requested Respondent represent him in filing a motion for drug and alcohol treatment. He also informed Respondent that if he (Respondent) declined to represent him in the filing of that motion, then he wanted a refund. Respondent did not respond to Mr. Cole's correspondence, did not provide a refund, and did not return the original transcripts.

On November 4, 2019, Mr. Cole filed a complaint against Respondent with Petitioner. Petitioner mailed and emailed Mr. Cole's complaint to Respondent and requested a written response no later than November 25, 2019. Respondent received these

---

[8] Mr. Cole asserted that he is eligible to file a second post-conviction petition because his conviction and sentence were entered prior to 1995. *See* MD. CODE ANN., CRIM. PROC. § 7-103(a).

communications but did not respond. Petitioner mailed and emailed a second request to Respondent, seeking a response to Mr. Cole's complaint. Respondent eventually provided an incomplete response, so Petitioner requested additional information and documentation, including a copy of Mr. Cole's client file. In an April 13, 2020, letter, Respondent provided a written response in the Cole matter but did not provide a copy of Mr. Cole's client file or any evidence of work performed on Mr. Cole's behalf.

### F. Representation of Nelson Contracting Company

Baltimore Glass Company, represented by Tracy Steedman, Esquire, filed on March 7, 2019, in the District Court of Maryland sitting in Baltimore City a suit alleging breach of contract against Nelson Contracting Company, owned by Richard Nelson.

The District Court granted a Consent Motion for Continuance filed by Ms. Steedman and scheduled trial for October 22, 2019. Ms. Steedman emailed Respondent a copy of the Order because Respondent's appearance had not yet been entered in the case, and she requested copies of any filings from Respondent.

Respondent filed on October 4, 2019, a Notice of Intention to Defend on behalf of Nelson Contracting but did not serve a copy on Ms. Steedman. Almost two weeks later, Respondent filed a Counterclaim against Baltimore Glass but did not provide a certificate of service. Ms. Steedman asked Respondent to email her a copy of the Counterclaim, but she received the Counterclaim by mail on October 25, 2019.

12

On the day of trial,[9] Ms. Steedman advised the District Court that her client did not intend to file a response to Respondent's Counterclaim because Respondent did not file a motion for leave to file out of time and did not cite any reason for good cause to do so. The District Court ordered Respondent to file within seven days on behalf of Nelson Contracting a motion for leave, to which Respondent agreed. The District Court issued a notice to the parties that the trial was rescheduled to November 19, 2019.

Respondent filed on October 29, 2019, a Motion for Leave to File Counter Complaint. Like in certificates of service attached to earlier filings, the certificate of service to this motion indicated that Respondent mailed the motion to Ms. Steedman on October 26, 2019, but the motion was not mailed on that date. Ms. Steedman did not receive it until November 5, 2019. Baltimore Glass opposed Respondent's motion, and Ms. Steedman emailed Respondent a courtesy copy of her opposition.

At the rescheduled trial, Respondent and Nelson Contracting failed to appear, and the District Court contemporaneously entered a default judgment in the amount of $6,157.00 plus $2,170.00 in interest, $46.00 in costs, and $2,498.34 in attorney's fees. The court also denied Respondent's Motion for Leave to File Counter Complaint and found that Nelson Contracting's Counterclaim was untimely. The District Court sent notice of the default judgment to all parties.

Respondent filed a Motion to Vacate the Judgment and to Dismiss Plaintiff's Complaint with Prejudice. Respondent argued that the judgment should be vacated

---

[9] Respondent, Nelson Contracting, and Ms. Steedman appeared for trial; Baltimore Glass was not present due to health concerns of the owner.

13

pursuant to Maryland Rule 3-535(a).[10] In the motion, Respondent knowingly and intentionally misrepresented to the District Court that neither he nor his client were notified of the rescheduled trial date when, contrary to this representation, Respondent agreed in open court to that date. Respondent also falsely claimed in the certificate of service that he mailed and emailed to Ms. Steedman a copy of the motion. Ms. Steedman never received a copy of the motion by mail, email, or any other manner.

When the District Court scheduled the matter for a hearing on January 29, 2020, and sent a Notice of Hearing, Ms. Steedman learned of Respondent's motion. She filed an opposition, arguing that Respondent did not file the motion within 30 days, as required by Maryland Rule 3-535(a) and requested attorney's fees under Maryland Rule 1-341. The District Court denied as untimely Respondent's Motion to Vacate and canceled the scheduled hearing.

Ms. Steedman subsequently filed a Memorandum in Support of the Motion for Attorney's Fees, citing Maryland Rule 1-341.[11] In a February 20, 2020, Order, the District

---

[10] Maryland Rule 3-535(a) provides "[o]n motion of any party filed within 30 days after entry of judgment, the court may exercise revisory power and control over the judgment and may take any action that it could have taken under Rule 3-534."

[11] Section (a) of Maryland Rule 1-341 (Bad Faith—Unjustified Proceedings) states that

> [i]n any civil action, if the court finds that the conduct of any party in maintaining or defending any proceeding was in bad faith or without substantial justification, the court, on motion by an adverse party, may require the offending party or the attorney advising the conduct or both of them to pay to the adverse party the costs of the proceeding and the reasonable expenses, including reasonable attorneys' fees, incurred by the adverse party in opposing it.

Court awarded Plaintiff attorneys' fees of $4,247.00, finding that Respondent "acted in bad faith in the handling of this matter and his representations to this Court by way of certifications and statements made in pleadings and motions" and that Respondent "filed pleadings and motions that lack[ed] substantial justification."

Respondent filed a Motion for Reconsideration of the February 20, 2020, Order and requested a hearing to vacate the default judgment. Although Respondent requested a hearing to vacate the court's judgment, he did not file a motion for reconsideration of the Order denying the motion to vacate. Respondent certified that he mailed the motion to Ms. Steedman on March 23, 2020, but the envelope containing the motion was postmarked March 31, 2020.[12]

Baltimore Glass filed an Opposition to Respondent's Motion for Reconsideration, as well as a second Maryland Rule 1-341 Motion for Sanctions. Respondent filed an Amended Motion for Reconsideration.[13] On April 27, 2020, the District Court denied Respondent's Amended Motion for Reconsideration and directed Ms. Steedman to file for the court's consideration a second supplemental motion to award attorney's fees supported by an affidavit. Ms. Steedman complied.

Respondent filed on May 27, 2020, in the Circuit Court for Baltimore City a Notice of Appeal of the April 27th Order and a response to Plaintiff's Motion for Sanctions. In a

---

[12] While it is possible that this mailing may have been delayed due to the postal delays that occurred at the inception of the COVID-19 pandemic, it nevertheless fits the pattern of misleading certificates of service similar to those that Respondent attached to other pleadings.

[13] For reasons unknown, the original was not docketed with the court.

May 29, 2020, Order, the District Court found that Respondent "acted in bad faith in the handling of this matter and his representations to this Court by way of certifications and statements made in pleadings and motions" and "found that [Respondent] filed pleadings and motions that lack substantial justification." Accordingly, the District Court awarded Plaintiff attorney's fees in the amount of $1,708.00 to be paid by Respondent. On June 9, 2020, the District Court notified the parties of the amended judgment in which the court added the $1,708.00 in attorney's fees awarded on May 29th to the $4,247.00 awarded on February 20th against Respondent.

On September 21, 2020, the circuit court docketed Respondent's appeal. Respondent's appellate memorandum was due October 21, 2020: 30 days after the appeal was entered on the docket. *See* Md. R. 7-113. Respondent filed an untimely Motion to Extend the Time to File the Appellants' Memorandum on the Merits and requested an extension to obtain an audio CD of the June 4, 2020, hearing in the District Court, but the hearing before the District Court was held on June 4, *2019*—not 2020. Ms. Steedman filed an opposition and a Motion for Dismissal of Appeal and Sanctions.

On November 4, 2020, the circuit court denied Respondent's Motion to Extend the Time to File as untimely, citing Maryland Rule 1-204(a)(3),[14] finding that Respondent failed to demonstrate excusable neglect. Baltimore Glass's Motions to Dismiss the Appeal

---

[14] Maryland Rule 1-204(a)(3) states, in pertinent part, that the court may "on motion filed after the expiration of the specified period, permit the act to be done if the failure to act was the result of excusable neglect."

and for Sanctions would be heard on December 8, 2020.  Respondent disregarded the court and filed an untimely appeal memorandum.

Respondent again knowingly and intentionally misrepresented in the certificate of service attached to the appeal memorandum that he served the memorandum on Ms. Steedman on November 6, 2020.  In a November 9, 2020, email, Respondent provided Ms. Steedman with the memorandum for the first time.  Respondent filed with the circuit court a Motion for Reconsideration of its November 4, 2020, Order, which the circuit court denied.

On December 8, 2020, the parties appeared before the circuit court for oral arguments on the record appeal.  In an Order dated that same day, the circuit court ruled that Respondent's failure to file timely the memorandum prejudiced Baltimore Glass, and the court dismissed the appeal; it denied Ms. Steedman's motion for sanctions at a later hearing.

Respondent filed in the Court of Special Appeals an untimely and improper Notice of Appeal of the November 4 and December 2, 2020, Orders.[15]  Pursuant to Maryland Rule 8-132, the Court of Special Appeals transferred the appeal to this Court.[16]  Ms. Steedman

---

[15] Respondent did not appeal the circuit court's December 8, 2019, Order dismissing the appeal.

[16] Maryland Rule 8-132 states:

If the Court of Appeals or the Court of Special Appeals determines that an appellant has improperly noted an appeal to it but may be entitled to appeal to another court exercising appellate jurisdiction, the Court shall not dismiss the appeal but shall instead transfer the action to the court apparently having

17

filed a Motion to Strike Respondent's Notice of Appeal for failing to comply with Maryland Rule 8-302(b), noting that an appeal from the circuit court "may be filed not later than 30 days after entry of the judgment of the circuit court." In a January 19, 2021, letter, the Clerk of the Court of Appeals notified Respondent that his Notice of Appeal would be treated as a petition for writ of certiorari. The Clerk further advised Respondent that if he wished to supplement the petition in accordance with the provisions of Maryland Rule 8-303, the supplement was due on March 5, 2021.

Respondent filed an Amended Notice of Appeal- Request for Writ of Certiorari, but that filing was untimely, as Respondent filed it more than 30 days after the January 11, 2020, and December 14, 2020, Orders. Ms. Steedman filed a Motion to Strike Respondent's Amended Notice of Appeal, asserting that Respondent's filing was defective and untimely. Respondent filed a Motion for Extension of Time to file a supplement in the Court of Appeals, which this Court granted and extended the time to file a supplement to the writ of certiorari no later than April 5, 2021. On April 6, 2021, however, Respondent filed an untimely Petition for Writ of Certiorari in this Court, and Ms. Steedman filed a Motion to Dismiss the Appeal. Ten days after the response was due (April 29, 2021),[17] Respondent filed an untimely opposition. In a June 22, 2021, Order, we denied

---

jurisdiction, upon the payment of costs provided in the order transferring the action.

[17] Ms. Steedman certified that a copy of the motion was served on Respondent via MDEC on April 14, 2021. Maryland Rule 8-431(b) provides that a response to a motion before the Court of Appeals "shall be filed within five days after service of the motion."

Respondent's Petition and Supplement for a Writ of Certiorari, as well as his subsequent Motion for Reconsideration.

Meanwhile, in the District Court matter, with respect to collection on the judgment, Respondent's oral examination was set for April 22, 2021. Although Respondent was served on December 18, 2020, with the Notice of the Oral Examination, he failed to appear. He did not file a motion for a protective order or otherwise assert a valid reason for his failure to appear.

## G. Respondent's Attorney Trust Account

On November 8, 2019, Wells Fargo Bank notified Petitioner that two PayPal transactions overdrew Respondent's attorney trust account by $63.22. In a November 15, 2019, letter, Petitioner requested that Respondent provide within 10 days of receipt of the letter an explanation for the overdraft and copies of his client ledgers, deposit slips, cancelled checks, and monthly bank statements for the period of September 2019 through November 15, 2019.

Respondent submitted a copy of his attorney trust account statement for September 2019, identifying five clients who paid funds in advance. Respondent claimed the September 2019 statement showed no activity because the clients permitted him to deposit funds into his operating account instead of his attorney trust account. Respondent did not provide any of the other requested documentation.

Petitioner emailed Respondent with a second request for copies of Respondent's client ledgers, deposit slips, cancelled checks, and monthly bank statements for the period of September 2019 to November 2019. Petitioner also requested copies of the retainer

agreements for the five clients that Respondent identified in the September 2019 statement. Respondent provided copies of his October 2019, November 2019, and December 2019 bank statements. He did not provide the other requested documentation: client ledgers, deposit slips, and cancelled checks. He admitted to Petitioner that he did not have signed retainer agreements from three of the five clients, and he did not provide signed retainer agreements for the other two clients. The bank statements reflected that Respondent had a PayPal account connected to his attorney trust account, which he used to pay personal expenses including a Showtime television network subscription.

In response to a subpoena issued to Wells Fargo Bank, Petitioner received Respondent's attorney trust account records. Charles Miller IV, CPA, Investigator for Petitioner, reviewed the records and prepared summaries. The summaries and Respondent's admissions showed that Respondent did not properly maintain his attorney trust account for the period of September 2017 through June 2018. The summaries also showed that Respondent maintained negative client ledgers, engaged in commingling of personal and client funds, and made personal expenditures from his attorney trust account. Specifically, in connection with clients Nate Ayer, L. Hodge, and Ed McCormick, Respondent withdrew attorney's fees from his attorney trust account at times when he was not holding funds for those clients. In addition to the two PayPal withdrawals, which caused the account to be overdrawn, Respondent made personal expenditures from his attorney trust account using a PayPal credit card, including on November 7, 2019, withdrawing $9.31 for "Showtime Law Office of Landon White," on November 21, 2019,

20

withdrawing $9.33 for "Tidal Law Office of Landon White," and on March 2, 2020, withdrawing $5.37 for "DocuSign Law Office of Landon White."

In a May 19, 2020, letter, Petitioner asked Respondent to provide no later than June 5, 2020, copies of his client ledgers for the period of August 2019 through May 2020. No response having been received, Petitioner again wrote to Respondent and requested that the relevant documents be provided no later than June 22, 2020. Petitioner wrote a third letter to Respondent, requesting copies of his client ledgers and advising Respondent that a review of his attorney trust account records had been completed. Petitioner requested that Respondent identify the client matters associated with numerous unknown transactions. Petitioner also asked Respondent to explain his disbursement of funds maintained on behalf of client Qiana Barnes, including how and when the remaining funds from her settlement check were disbursed.

On August 17, 2020, Respondent wrote to Petitioner but did not identify the client matters associated with the unknown transactions. With respect to Ms. Barnes, Respondent stated that he advanced $3,000.00 to Ms. Barnes prior to receiving her settlement funds and that when he received Ms. Barnes's settlement funds, he retained a larger share to pay back the advanced funds and to pay his fees.

Respondent provided in an August 25, 2020, letter what was purported to be client ledgers for the period requested: August 2019 through May 2020. The ledgers did not comply with the requirements of Maryland Rule 19-407 and could not be reconciled with the attorney trust account records received from Wells Fargo. Respondent provided ledgers for 39 clients, indicating that he received advance funds on behalf of those clients, yet his

21

attorney trust account records did not reflect any deposits on behalf of those clients. For example, Respondent provided a client ledger for William Barnett, which reflected that Respondent received $5,000.00 on behalf of Mr. Barnett on August 30, 2019. Respondent's attorney trust account records, however, reflected no transactions on behalf of Mr. Barnett nor a deposit of $5,000.00 into the account on or around August 30, 2019.

Respondent's ledgers did not show that he deposited legal fees and expenses that were paid in advance into his attorney trust account, and nothing indicated that he obtained written, informed consent to deposit the funds into his operating account. The client ledgers provided by Respondent for clients Lewis Lyles and Marcel Jacks did not reflect the funds maintained and disbursed from his attorney trust account. The client ledger for Mr. Lyles shows Respondent received on July 11, 2019, $6,000.00 on behalf of Mr. Lyles and made disbursements on July 11 ($2,000.00), August 5 ($1,000.00), September 17 ($1,000.00), and October 28, 2019 ($2,000.00). Conversely, Respondent's attorney trust account records reflected a $1,000.00 deposit into the account on behalf of Mr. Lyles on August 2, 2019, and disbursements of $600.00 on August 5th and $400.00 on August 12th of 2019. The client ledger for Mr. Jacks showed that Respondent received on March 2, 2020, $20,000.00 on behalf of Mr. Jacks and disbursed $10,000.00 the same day. Yet, Respondent's attorney trust account records reflected a $10,000.00 deposit into the account on behalf of Mr. Jacks on March 2, 2020, and disbursements of $3,000.00 on March 12 and $4,500.00 on April 29, 2020.

Finally, Respondent's ledgers and his attorney trust account records indicated that he improperly split fees with an attorney outside of his firm in connection with several

22

client matters without obtaining the clients' written agreement to the joint representation; there were no written agreements for clients Malik Smith and Ashley Johnson. Respondent did not produce any evidence that he had obtained the clients' agreement to the joint representation in writing or otherwise.

## II.     HEARING JUDGE'S CONCLUSIONS OF LAW

The hearing judge concluded that Respondent violated MARPC 1.1; 1.2(a); 1.3; 1.4; 1.5(a), (c), and (e); 1.8(e); 1.15; 1.16(d); 3.1; 3.3(a); 8.1(a)–(b); 8.4(a), (c)–(d); and Maryland Rules 19-407(a) and 19-410(b)–(c).

Petitioner did not file exceptions. Respondent did not file any exceptions to the hearing judge's conclusions of law; he challenged only the hearing judge's findings of fact, one aggravating factor, and asserted a violation of his constitutional rights. We now address those concerns.

## III.     STANDARD OF REVIEW

This Court analyzes a hearing judge's findings of facts against the clearly erroneous standard. Md. R. 19-740(b)(2)(B); *Att'y Grievance Comm'n v. Collins*, 477 Md. 482, 495 (2022). This Court reviews *de novo* all conclusions of law, Md. R. 19-740(b)(1), and Petitioner bears the burden of establishing by clear and convincing evidence a violation of the MARPC. *Id.* 19-727(c).

## IV.     EXCEPTIONS

Respondent makes three exceptions. First, he believes the hearing judge erred by solely relying on the facts deemed admitted, by virtue of his failure to respond timely to Petitioner's request for admissions, to support the hearing judge's findings of fact. Second,

23

he contends that the hearing judge was mistaken that his alleged MARPC violations all occurred before he entered into the CDA, which, Respondent believes, the hearing judge viewed as an aggravating factor. Third, he argues that Petitioner deprived him of his due process rights by collectively handling the Frazier and Cole matters. We address each exception in turn.

## A. *Use of Requests for Admissions*

Respondent excepts to the entirety of the hearing judge's findings of fact with respect to the Hamilton, Crudup, Frazier, and Cole matters. In his view, "the Trier of Fact erred in receiving and adopting the five hundred plus admissions propounded by the Petitioner upon the Respondent as the sole and exclusive evidence of the Respondent's misconduct in the[se] . . . matters." To that end, Respondent believes that "the use of Admissions in this manner is improper and that the Court cannot base its Findings of Fact and Conclusions of Law exclusively upon evidence derived from [his] failure to adequately respond to the Petitioner's propounded requests for Admissions." We disagree with Respondent. Before denying this exception, however, we first offer an instructive caveat as to Petitioner's use of discovery.

Petitioner served on Respondent over 500 requests for admissions of facts and genuineness of documents and over 2,000 pages of accompanying exhibits. In some instances, Petitioner asked that Respondent admit representations that involved subjective opinions or legal conclusions. In other instances, Petitioner should have known that Respondent had no personal knowledge of the facts or documents for which admissions were requested (and had no way through reasonable inquiry to obtain sufficient information

24

to enable him to admit or deny the requests), and Petitioner should have known that some of the information Respondent was asked to admit would have been inadmissible at a disciplinary hearing under the applicable rules of evidence.[18]

---

[18] Although the following is not the sole instance to which our caveat applies, for instance, in the Request for Admissions, Petitioner asked that Respondent admit the following:

345. The factual averments in the attached Exhibit 49 are true and correct.

346. The factual averments in the attached Exhibit 50 are true and correct.

***

351. The factual averments in the attached Exhibit 63 are true and correct.

352. The factual averments in the attached Exhibit 64 are true and correct.

These Exhibits are the memoranda of an investigator in Petitioner's office, which describe actions the investigator took and interviews the investigator conducted with witnesses. For example, Exhibit 49 states:

On April 16, 2020, this investigator made arrangement with Jessup Correctional Institute to interview the complainant Mr. Robert Frazier an inmate at that facility. This investigator spoke to Mr. Frazier on this date at 10:30AM telephonically due to the virus. Mr. Frazier stated that he was arrested in 1988 and charged with two Homicides, he was sentenced to life without parole.

This investigator asked Mr. Frazier why he chose Respondent to represent him in his hearing for Writ of Actual Innocence? Mr. Frazier stated that he never retained Respondent his son Robert Johnson retained Respondent. Mr. Frazier stated that he prepared his own Writ and submitted it to the court. The States Attorney filed an answer and he then filed his response to that Motion. Mr. Frazier stated that a hearing was scheduled with the court.

Mr. Frazier stated that on the day of the hearing he went to court and was waiting to be called and he was approached by Respondent who identified himself as Mr. Landon White and told Mr. Frazier he had been retained by his son to represent him. Mr. Frazier stated at the hearing all he did was get the case postponed.

Mr. Frazier stated that he never met with or spoke to Respondent

In sum, Petitioner served Respondent with 37 pages of Requests for Admissions and attached 125 exhibits totaling 2,087 pages. The Request for Admissions asked that Respondent admit the truthfulness of 391 factual representations and the genuineness of 125 documents—516 requests for admissions in total. Although we recognize that serving requests for admission can be a useful tool to streamline a trial by enabling the parties to stipulate to undisputed facts and the admission of documents, the requests should be reasonable under the circumstances. Here, the Request for Admissions seemed to anticipate that Respondent might fail to respond and, thereby, be deemed to have admitted facts that he otherwise would not have admitted and that otherwise might not have been admissible at the disciplinary hearing. Asking Respondent to admit to the factual averments that we describe specifically in footnote 18, and many other requests for

---

before the second hearing. This investigator asked Mr. Frazier he never heard from or was prepared by Respondent prior to going to court? Mr. Frazier stated that Respondent sent some Para-Legal to meet with him, he does not recall his name, but this individual had no idea about the case and knew nothing of what he was trying to accomplish.

Mr. Frazier stated at the second hearing Respondent was totally unprepared and did a terrible job. Mr. Frazier stated that this agency should obtain copies of the transcript of the hearing and they will clearly show how inept Respondent was. Mr. Frazier stated that at the end of the hearing Judge Peters stated he would render a decision later.

Bar Counsel's Request for Admissions asked that Respondent admit that the averments in Exhibit 49 are true. It is one thing to ask that a respondent admit facts concerning the representation of a complainant or an interaction with a witness but quite another matter to ask that a respondent admit that Petitioner's investigator conducted an interview on a given date, that the interviewee provided specific information to the investigator, and that the investigator accurately summarized the content of the interview in a memorandum.

admissions not detailed here[19] and otherwise served on Respondent, was unreasonable. Nonetheless, for the reasons explained below, we do not sustain this exception.

Our analysis starts, as it always does, with the plain meaning of the rule. If it is "clear and unambiguous, we need not look beyond the language of the rule to inform our analysis." *Att'y Grievance Comm'n v. Tatung*, 476 Md. 45, 74 (2021) (citing *Lisy Corp. v. McCormick & Co., Inc.*, 445 Md. 213, 221 (2015)). Maryland Rule 2-424(a) states, in pertinent part, that a party may "serve one or more written requests to any other party for the admission of . . . the truth of *any relevant matters of fact set forth in the request.*" (Emphasis added). Each matter for which an admission is requested is

> deemed admitted *unless*, within 30 days after service of the request or within 15 days after the date on which that party's initial pleading or motion is required, whichever is later, the party to whom the request is directed serves a response signed by the party or the party's attorney.

*Id.* 2-424(b) (emphasis added). "Any matter admitted under this Rule is conclusively established unless the court on motion permits withdrawal or amendment." *Id.* 2-424(d). In determining whether to exercise its discretion to permit withdrawal or amendment, the circuit court must consider whether: (1) such withdrawal or amendment "would assist the presentation of the merits of the action" and (2) "the party who obtained the admission [can] satisfy the court that [such action] will prejudice the party in maintaining the action or defense on the merits." *Id.*

---

[19] In addition, for example, Petitioner asked Respondent to confirm the genuineness of correspondence from attorneys and others to Petitioner, and from Petitioner to third parties, *i.e.*, communications to which Respondent was not a party and would have had no way of confirming genuineness.

27

Maryland Rule 2-424 contains no quantitative limitation, and we decline to read one into the rule. The discovery process naturally will change to fit the facts of a particular case. What is reasonable for one case may not be so for another. At oral argument, the Court asked Petitioner whether 500 requests for admissions was normal, and Petitioner responded that so many requests were necessary given these particular facts: There were five separate client matters, as well as general financial mismanagement, and the sheer breadth of Respondent's misconduct warranted the volume of requests.

Nevertheless, the absence of any express quantitative limitation in Maryland Rule 2-424 does not leave a party helpless. The rules contemplate that some discovery requests may be unreasonable and provide at least one avenue for an aggrieved party to seek refuge. Maryland Rule 2-403(a) permits a court, upon motion demonstrating good cause, to enter an order to protect a party from annoyance, embarrassment, oppression, or undue burden or expense. The court can fashion a variety of remedies including, as relevant here, prohibiting Petitioner's discovery altogether or limiting the scope of the discovery to certain matters. While Respondent sought protection from Petitioner's discovery requests, the hearing judge ultimately denied that request.

We move next to the substance of Petitioner's request for admissions. Respondent avers that requests "involving questions of ultimate issues of fact and or law are impermissible." Resp.'s Exceptions at 2 (citing *St. James Constr. Co. v. Morlock*, 89 Md. App. 217 (1991), *cert. denied*, 325 Md. 526 (1992)). Respondent misconstrues the intermediate appellate court's analysis in that case. As relevant to this case, the issue in *St. James* was whether the circuit court erred in denying the Morlocks' motion for attorneys'

28

fees and other expenses pursuant to Maryland Rule 2-424(e).[20]  89 Md. App. at 222.  In

their motion, the Morlocks argued that St. James refused to admit 15 out of 71 requests for

admissions,[21] but the trial court held that those refusals were made in good faith.  *Id.* at

229.  In sustaining the trial judge's denial of the motion for attorneys' fees, the Court of

Special Appeals stated:

> "Requests for admissions of fact serve a limited but useful function.  Because
> of their misuse, however, parties do not obtain a great deal of satisfaction
> from them as a discovery device.  Regularly the propounding party seeks to
> obtain more of an admission than that to which he is entitled and
> consequently the answer given is all but useless.  The purpose of the rule is
> not to press known discovery requests.  Rather, it is intended to eliminate
> from trial those matters over which the parties truly have no dispute . . . .  The
> authenticity of documents, the corporate status of parties, and the undisputed
> foundation for evidence are but examples."

*Id.* at 230 (quoting Niemeyer and Richards, *Maryland Rules Commentary* 234–35 (1984)).

---

[20] That rule states that if a party fails to admit the genuineness of any document or the truth of any matter requested under Maryland Rule 2-424(a) by another party, and the requesting party later proves said genuineness or truthfulness, then the requesting party may move for an order requiring the other party to pay reasonable expenses incurred in proving the genuineness or truthfulness.  The court is required to enter the requested order *unless* it finds that

> (1) an objection to the request was sustained pursuant to section (c) of this Rule, or (2) the admission sought was of no substantial importance, or (3) the party failing to admit had reasonable ground to expect to prevail on the matter, or (4) there was other good reason for the failure to admit.

Md. R. 2-424(e).

[21] Some of the facts that St. James refused to admit were those that conclusively would have established that St. James was negligent and created unreasonable risks of harm.  *St. James*, 89 Md. App. at 230–31.  As the Court of Special Appeals put it, "[m]any of the requests additionally contained terms of such an ambiguous nature that no attorney worth his or her salt would allow their client to admit to them."  *Id.* at 230.

29

Most of those requests for admissions concerned ultimate issues of fact. In essence, "in all of these requests the Morlocks were seeking to obtain more than they were entitled to. As a result, they deserved whatever responses they received." *Id.* at 231.

Excluding that any holding from *St. James* is not binding upon this Court, we do not read that opinion to paint with as large a stroke as Respondent would have us believe. The Court of Special Appeals did not hold that the Morlocks' request for admissions was void ab initio because it stretched beyond matters that the rule is intended to cover. Rather, its holding, in its simplest form, can be boiled down to the following: Where (1) a party serves on another a request for admissions that addresses issues of ultimate facts in a case, (2) the receiving party refuses to admit, and (3) the propounding party eventually prevails in proving the requested admissions, then (4) the propounding party likely *will not* prevail on a motion for attorneys' fees under Maryland Rule 2-424(e) because the propounding party's request exceeds the rule's intended scope.

Respondent also cites to *Gonzales v. Boas*, 162 Md. App. 344, *cert. denied*, 388 Md. 405 (2005), but that case factually is distinguishable from Respondent's. Gonzales filed against Boas a complaint alleging three counts of civil battery. *Gonzales*, 162 Md. App. at 350. Boas responded by filing motions to dismiss and for a more definite statement, as well as discovery requests including a request for admissions of fact. *Id.* Counsel for Gonzales accidentally placed the response to the request for admissions in the client file instead of mailing it, and Gonzales missed the deadline to respond. *Id.* n.2. Boas subsequently moved for summary judgment; Gonzales filed a response to the motion and a late response to the request for admissions. *Id.* at 351. Gonzales argued that, although

30

late, her response to the request for admissions could be stricken only upon motion, which meant there currently were material facts in dispute; she alternatively requested that she be allowed to withdraw any deemed facts. *Id.* Boas responded by filing a motion to strike the untimely response, and Gonzales submitted an opposition to the motion to strike. *Id.* The circuit court granted Boas's original motion to dismiss and allotted Gonzales 20 days to file an amended complaint.[22] *Id.* Gonzales did so, and Boas filed a second motion for summary judgment, again asserting that there were no issues of material fact in dispute. *Id.* at 351–52. The trial court struck Gonzales's late response and entered summary judgment for Boas. *Id.*

The Court of Special Appeals held that the trial court abused its discretion in granting the motion to strike or, in the alternative, failing to permit Gonzales to withdraw the deemed admissions under section (d), *id.* at 354, because "nothing in the record . . . indicate[d] that the court exercised its discretion as to whether to permit 'withdrawal or amendment' of the deemed admissions pursuant to Rule 2-424(d)[,]" *id.* at 358. In its view, the circuit court "provided no explanation for its decision to strike [Gonzales's] response except that it was untimely," *id.*; it failed to consider how withdrawal would aid in the presentation of the merits, *id.* at 359; and made no findings as to any possible prejudice that Boas would face if withdrawal were permitted, *id.* at 361. Lastly, the intermediate appellate court addressed Gonzales's own culpability. It found that the conduct "was not

---

[22] The court denied as moot the motion for a more definite statement and summary judgment but did not rule on Boas's motion to strike Gonzales's late response to the request for admissions.

31

egregious"; counsel for Gonzales provided an adequate explanation as to why the response was late and filed one only eight days past the deadline. *Id.* at 357, 361.

*Gonzales* procedurally is distinguishable from Respondent's case. Unlike Respondent, who provided Petitioner with an exceptionally late response, Gonzales filed only eight days late a response to the request for admissions, provided an explanation as to why the response was late, asked, prior to Boas filing a motion to strike, that she be permitted to withdraw any deemed admissions, and, once Boas did file a motion to strike, filed an opposition to the motion to strike her untimely response. *See id.* at 351 n.2, 357, 361. Respondent, unlike Gonzales, never asked the hearing judge to permit withdrawal of the admissions. *See* Md. R. 2-424(d). Thus, unlike in *Gonzales* where the Court of Special Appeals was asked to review the trial judge's refusal to permit withdrawal, there is no action from the hearing judge that we can review for abuse of discretion. *See Gonzales*, 162 Md. App. at 351, 354. Respondent, therefore, cannot draw any meaningful connection between his case and *Gonzales*. After Petitioner sent to Respondent its request for admissions, he failed to respond timely or provide any explanation for his untimely response. That is a far cry from the facts of *Gonzales*.

While the Court of Special Appeals in *Gonzales* stated that the purpose of Maryland Rule 2-424 is to eliminate issues over which the parties truly do not dispute, citing language from *St. James*, Respondent ignores that the court also recognized that "deemed admissions may properly embrace material or 'ultimate' issues of fact in a case[.]" *Id.* at 360 (citing *Murnan v. Joseph J. Hock, Inc.*, 274 Md. 528, 529–31 (1975)). Thus, the *Gonzales* court stamped its imprimatur—citing precedent from this Court—on the very action that

32

Respondent now would have us reject. We decline his invitation, albeit implicit, to overrule any of our precedent in this area.

Maryland Rule 2-424 similarly contains no express qualitative restrictions regarding the substance of the admissions that a party may attempt to obtain. To the contrary, a party may request that an opposing party admit the "truth of *any relevant matters of fact set forth in the request*." Md. R. 2-424(a) (emphasis added). While the purpose of the rule may be to eliminate from trial less trivial matters, there is nothing that prevents a party from using the rule in a broader fashion. In that case, it is incumbent upon the receiving party to answer in the negative the broad request for admissions, or, in the case where the receiving party fails to respond, diligently and timely seek withdrawal or amendment of those admissions. *See id.* 2-424(d); *Murnan*, 274 Md. at 530 (noting that the request for admissions of fact in that case asked that the defendant corporation to admit to the very heart of the dispute: that the defendant installed sand to a depth of five inches instead of only two inches, as requested by the plaintiff).

In addition to those already articulated, we further find for two reasons that the hearing judge's acceptance and reliance on the admitted facts were not an abuse of discretion. First, we permit hearing judges to use facts admitted under Maryland Rule 2-424 to prove in a disciplinary proceeding an attorney's misconduct. In *Attorney Grievance Commission v. McCarthy*, Petitioner similarly served on McCarthy a request for admissions of facts and genuineness of documents, which sought McCarthy's admission to the genuineness of 28 exhibits and two facts: his bar admittance date and that he maintained an office for the practice of law in Anne Arundel County, Maryland. 473 Md.

462, 469 (2021). McCarthy responded to the request over one year later, but the hearing judge held that McCarthy's delay warranted sanctions; the documents and facts were deemed admitted, and McCarthy was precluded from providing any testimony to contradict them. *Id.* at 469, 478. McCarthy excepted to the hearing judge's findings of facts, which were based on the admitted facts and genuineness of the documents, requesting, among other things, a new hearing. *Id.* at 481. In denying McCarthy's request, this Court strictly adhered to the plain language of Maryland Rule 2-424, stating that

> the hearing judge's grant of the motion for sanctions did not result in prejudice to McCarthy, given that, as discussed below, the facts and genuineness of the documents referred to in the request for admissions were automatically deemed admitted pursuant to Maryland Rule 2-424(b) once McCarthy missed the deadline for responding to the request. Any evidence that McCarthy would have presented at the disciplinary hearing but for the hearing judge's grant of the motion for sanctions would not have negated the facts set forth in the request for admissions that were deemed admitted by operation of Maryland Rule 2-424(b).

*Id.* at 482.

We went on to discuss that Maryland Rule 2-424(b) operates automatically as a matter of law without the need for motion or court order deeming any unanswered requests admitted. *Id.* at 485 (citing *Att'y Grievance Comm'n v. Barton*, 442 Md. 91, 120–21 (2015); *Att'y Grievance Comm'n v. Robertson*, 400 Md. 618, 635 (2007); and *Att'y Grievance Comm'n v. Kapoor*, 391 Md. 505, 530 (2006)). Thus, there procedurally is nothing new about Petitioner proving its case-in-chief with facts deemed admitted due to an attorney's failure to respond or dilatory tactics.[23]

---

[23] But our holding in *McCarthy* as to the effect of a failure to respond to requests for the admissions of facts and the genuineness of documents did not grant Petitioner a

34

Second, the hearing judge in this case—in an exercise of judicial restraint and good judgment—afforded Respondent numerous opportunities to respond to the request for admissions and permitted Respondent the opportunity to present evidence to rebut the facts deemed admitted.[24] *See id.* at 478–79. Thus, practically speaking, Respondent did not suffer any real prejudice when the facts contained in the request for admissions were deemed admitted by straightforward application of Maryland Rule 2-424. This exception, therefore, is overruled.

### B. Pre-CDA Conduct as an Aggravating Factor

Respondent's second exception is nothing more than a misreading of the hearing judge's Findings of Fact and Conclusions of Law. He essentially claims that the hearing judge was under the impression that the alleged violations occurred *after* he consented to the CDA. A close reading reveals this is not so. The hearing judge listed as an aggravating factor Respondent's "continuous[] mismanage[ment of] his attorney trust account even after being placed in a [CDA]." The remainder of the aggravating factors cited by the

---

blank check to use requests for admissions of facts and genuineness of documents without consideration of the substance and volume of the requests.

[24] In a November 23, 2021, Order, the hearing judge found, among other things, that (1) Petitioner submitted on July 29, 2021, its original request for admissions; (2) Respondent received the request on October 4, 2021; (3) Respondent failed to submit a response to the court's previously ordered October 19, and November 4, 2021, deadlines; (4) on November 4, 2021, Respondent—instead of answering the request—filed a motion for a protective order, which was denied; and (5) Respondent finally filed on November 21, 2021, a response to the request. The hearing judge ultimately ordered that the request for admissions be deemed admitted and that Respondent was not precluded from presenting any evidence at the hearing in this matter that contradicts the facts established by Petitioner's request for admissions.

hearing judge, *see infra* Part VI, concern Respondent's conduct generally without any temporal qualifier. Petitioner has alleged, and the hearing judge found, that Respondent's mismanagement of his attorney trust account occurred after he consented to the September 2019 CDA. Thus, the hearing judge did not—as Respondent alleges—find that Respondent's conduct in the Frazier, Cole, Hamilton, Crudup, and Nelson Contracting matters was an aggravating factor because it occurred after he consented to the CDA. This exception plainly is contrary to the record, so we overrule it.

### C. Collective Handling of the Frazier and Cole Matters

Respondent offers no substantive argument for this exception; he merely asserts that these two matters "where [sic] not handled independently by the Petitioner . . . but collectively in such a manner that the Respondent was deprived of his due process rights to individually confront the allegations against him and should not have been considered or included in this prosecution." For at least three reasons, this argument fails.

First, "[i]t is well established that 'procedural due process requires that litigants must receive notice, and an opportunity to be heard.'" *Mayor of Balt. v. Prime Realty Assocs., LLC*, 468 Md. 606, 622 (2020) (quoting *Pickett v. Sears, Roebuck & Co.*, 365 Md. 67, 81 (2001)). When it comes to violations of constitutional rights, we require individuals to plead more than just bare allegations without any legal or factual support. *Cf. Barbee v. Warden of Md. Penitentiary*, 220 Md. 647, 650 (1959) ("A mere allegation that one has been denied constitutional guarantees, without setting forth facts substantiating a violation of such rights, is not a sufficient reason for setting aside a sentence under post conviction procedure."). Petitioner has done just that. He asserts nothing more than a broad violation

36

of his due process rights, an allegation of error that is void of any supporting legal argument or basis in the record. In essence, it lacks any indicia of a sufficient appellate argument. *See* 5 Am. Jur. 2d *Appellate Review* § 476 (May 2022 update) ("[Appellate] argument must explain why, in the context of the case, the law supports the claim of reversible error; it should advise the appellate court how principles of law and the facts of the case interact." "The argument must be more than a single sentence or a mere reiteration of the statement of issues, and no issue is presented for review by a series of allegations or conclusions with no citation to authority or the record." (footnotes omitted)). We decline to entertain this ill-presented and overly broad argument.

Second, as discussed above, Petitioner was permitted to establish Respondent's conduct by relying on Petitioner's request for admissions, which were admitted by strict operation of law. *See* Md. R. 2-424(b); *McCarthy*, 473 Md. at 485. Thus, those facts already were "conclusively established," Md. R. 2-424(d), so there was nothing left for Respondent to "confront[.]" Furthermore, the hearing judge informed Respondent that he could present evidence to refute the established facts—something the hearing judge was not required to do. Thus, Respondent was not in as helpless a situation as he would have this Court believe. That he chose not to take advantage of the hearing judge's discretion on this matter does not create a constitutional violation.

Third, Respondent appears to labor under the incorrect assumption that had Petitioner individually handled outside this proceeding the Frazier and Cole matters, it somehow would make a difference in the outcome of this matter. We often consider, however, as an aggravating factor and in determining the appropriate sanction, an

37

attorney's history of disciplinary proceedings. Thus, even if the Frazier and Cole matters individually were handled, Petitioner presumably would have brought two separate actions for those matters, which eventually would have come before this Court and is something we then could consider in determining his sanction. In essence, the separate handling of the Frazier and Cole matters would not have shielded them from our consideration.

Because Respondent's argument is overly broad and supported by neither the facts nor the law, we overrule this exception.

## V. DISCUSSION

Having dispensed with Respondent's exceptions and concluded that the hearing judge's use of the admissions was not clearly erroneous, we now turn to address the hearing judge's sustained violations.

### A. Rule 1.1

Rule 1.1 states that attorneys "shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." An attorney violates Rule 1.1 when he or she fails "to apply the requisite thoroughness and/or preparation in representing a client[,]" *Att'y Grievance Comm'n v. Karambelas*, 473 Md. 134, 159 (2021) (quoting *Att'y Grievance Comm'n v. Guida*, 391 Md. 33, 54 (2006)), or "fails to act or acts in an untimely manner, resulting in harm to his or her client[,]" *id.* (quoting *Att'y Grievance*

38

*Comm'n v. Garrett*, 427 Md. 209, 222–23 (2012)). We agree with the hearing judge that Respondent violated Rule 1.1 in the Frazier, Crudup, Cole, and Nelson Contracting matters.

From the date Respondent began representing Mr. Frazier (December 14, 2016) until Mr. Frazier's hearing on his Petition for Writ of Actual Innocence (March 8, 2017), Respondent failed to communicate with Mr. Frazier. This resulted in both Respondent and Mr. Frazier being unprepared for the hearing. Respondent failed to inform Mr. Frazier of the circuit court's February 2018 denial of Mr. Frazier's Petition or provide a copy thereof. Respondent untimely filed a Notice of Appeal, failed to pay the proper filing fee, and never drafted an appellate brief. As a result, the appeal was dismissed. Mr. Frazier was kept in the dark about all of this. It was not until March 2019, when Mr. Frazier's son, Mr. Johnson, learned of the circuit court's denial of the Petition, that Respondent met with Mr. Johnson. Even then, Respondent intentionally misrepresented to Mr. Johnson that there still was time to file an appeal. Respondent's inaction in the Frazier matter clearly harmed his client, as both Mr. Frazier and Respondent were unprepared for the hearing, and because Mr. Frazier lost his chance to appeal.

Regarding the Crudup matter, after Respondent entered his appearance in the U.S. District Court for the District of Maryland, Respondent informed Mr. Crudup that he (Mr. Crudup) failed to exhaust his administrative remedies prior to the filing of the complaint. When Mr. Crudup relayed that he no longer desired to pursue his claim in federal court, Respondent should have taken the steps necessary to withdraw the complaint. Instead, Respondent failed to withdraw the complaint, did not respond to the Government's motion to dismiss, and did not withdraw his appearance. All of this demonstrated a clear lack of

thoroughness on Respondent's part.

When Mr. Cole retained Respondent on December 10, 2016, he instructed Respondent either to file a motion to reopen his (Mr. Cole's) closed post-conviction case or to file a second petition. Mr. Cole terminated Respondent's services on June 24, 2019. In those roughly two-and-a-half years, Respondent took *no* action on Mr. Cole's behalf. Respondent also ignored Mr. Cole after Mr. Cole requested a refund and the return of his transcripts. Respondent demonstrated a lack of thoroughness representing Mr. Cole, and his inaction harmed Mr. Cole, who received from Respondent no legal services, refund of money paid, or original transcripts. This all was a clear violation of Rule 1.1.

As previously mentioned, Nelson Contracting retained Respondent for representation in a breach-of-contract matter in the District Court of Maryland sitting in Baltimore City. Like with the other matters, Respondent either failed to act or acted untimely, thereby harming his client. Not only did he fail to appear for trial, resulting in a default judgment against Nelson Contracting, but he also failed to file or untimely filed a: Counterclaim; Motions to Vacate Judgment, for Reconsideration of an Award of Attorney's Fees, to Extend Time to File a Memorandum on the Merits; and a Notice of Appeal to the Court of Special Appeals. After the intermediate appellate court transferred the appeal to this Court, Respondent untimely filed even more documents: an Amended Notice of Appeal, a Petition for Writ of Certiorari, and an Opposition to Appellee's Motion to Dismiss Appeal.

We are left with little doubt that the conduct in each client matter establishes separate violations of Rule 1.1.

40

## *B. Rule 1.2*

Rule 1.2(a) states:

> Subject to sections (c) and (d) of this Rule, an attorney shall abide by a client's decisions concerning the objectives of the representation and, when appropriate, shall consult with the client as to the means by which they are to be pursued. An attorney may take such action on behalf of the client as is impliedly authorized to carry out the representation. An attorney shall abide by a client's decision whether to settle a matter. In a criminal case, the attorney shall abide by the client's decision, after consultation with the attorney, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

"An attorney violates Rule 1.2(a) 'if he or she fails to inform a client of the status of his or her case, thereby denying the client the ability to make informed decisions.'" *Att'y Grievance Comm'n v. Planta*, 467 Md. 319, 348 (2020) (quoting *Att'y Grievance Comm'n v. Hamilton*, 444 Md. 163, 182 (2015)).

We agree with the hearing judge that Respondent violated Rule 1.2(a) with respect to Mr. Frazier when he (Respondent) failed to: (1) communicate with Mr. Frazier prior to the hearing on Mr. Frazier's Writ of Actual Innocence, (2) inform Mr. Frazier of the circuit court's denial of the Writ, (3) communicate that he filed an appeal, (4) draft an appellate brief, and (5) inform Mr. Frazier that the appeal was dismissed. Respondent's conduct clearly shows that he never kept Mr. Frazier abreast of the status of his case or even informed him that he attempted to appeal the circuit court's denial. Such evidence supports the hearing judge's conclusion that Respondent violated Rule 1.2(a) because Respondent kept information from Mr. Frazier, which, in turn, prevented Mr. Frazier from being able to make informed decisions regarding his own representation.

41

## C. Rule 1.3

Rule 1.3 states that "[a]n attorney shall act with reasonable diligence and promptness in representing a client." In its simplest form, "an attorney violates Rule 1.3 when he or she does 'nothing whatsoever to advance the client's cause or endeavor.'" *Att'y Grievance Comm'n v. Moawad*, 475 Md. 424, 469 (2021) (quoting *Att'y Grievance Comm'n v. De La Paz*, 418 Md. 534, 554 (2011)).

The hearing judge concluded that Respondent violated Rule 1.3 with respect to the specified clients (for the reasons articulated for his violations of Rule 1.1), and we agree. In all matters, Respondent did very little, if anything, to advance the interests of those clients. In the few instances he did act, he often submitted late pleadings resulting in prejudice to his clients. Therefore, our independent review also shows that Respondent violated Rule 1.3.

## D. Rule 1.4

In its entirety, Rule 1.4 states:

(a) An attorney shall:

(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 19-301.0 (f) (1.0), is required by these Rules;

(2) keep the client reasonably informed about the status of the matter;

(3) promptly comply with reasonable requests for information; and

(4) consult with the client about any relevant limitation on the attorney's conduct when the attorney knows that the client expects assistance not permitted by the Maryland Attorneys' Rules of Professional Conduct or other law.

42

(b) An attorney shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

Rule 1.4 is rather straightforward: "an attorney violates Rule 1.4 'when the attorney fails to communicate crucial information about the status of the case [to the client].'" *Att'y Grievance Comm'n v. Kane*, 465 Md. 667, 711 (2019) (alteration in original) (quoting *Hamilton*, 444 Md. at 185). The hearing judge concluded that Respondent violated Rule 1.4 with respect to the Cole, Frazier, and Hamilton matters. We affirm these conclusions. As our analysis for Rule 1.1 shows, Respondent kept these clients in the dark about their legal matters. Respondent would go months—sometimes even years—without communicating with his clients, failing to keep them abreast of the status of their claims or even diligently pursue them. Respondent's inadequate communication with these clients is a textbook example of a Rule 1.4 violation. We, thus, agree with the hearing judge.

### *E. Rule 1.5*

Rule 1.5 outlines the standards by which attorneys must abide when it comes to fees. It states, in pertinent part:

(a) An attorney shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the attorney;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

43

(7) the experience, reputation, and ability of the attorney or attorneys performing the services; and

(8) whether the fee is fixed or contingent.

(b) The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation, except when the attorney will charge a regularly represented client on the same basis or rate. Any changes in the basis or rate of the fee or expenses shall also be communicated to the client.

(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by section (d) of this Rule or other law. A contingent fee agreement shall be in a writing signed by the client and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the attorney in the event of settlement, trial or appeal; litigation and other expenses to be deducted from the recovery; and whether such expenses are to be deducted before or after the contingent fee is calculated. The agreement must clearly notify the client of any expenses for which the client will be responsible whether or not the client is the prevailing party. Upon conclusion of a contingent fee matter, the attorney shall provide the client with a written statement stating the outcome of the matter, and, if there is a recovery, showing the remittance to the client and the method of its determination.

\*       \*       \*

(e) A division of a fee between attorneys who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each attorney or each attorney assumes joint responsibility for the representation;

(2) the client agrees to the joint representation and the agreement is confirmed in writing; and

(3) the total fee is reasonable.

With respect to the Cole and Frazier matters, the hearing judge made similar conclusions: Respondent violated Rule 1.5(a) when he took from each $4,000.00 and ultimately provided no services. Respondent failed to file either a petition to reopen Mr. Cole's first post-conviction proceeding or a second petition for post-conviction relief. As

44

to Mr. Frazier, he failed to adequately prepare himself or Mr. Frazier for the hearing on the Writ of Actual Innocence, and additionally failed to appeal timely. Because Respondent virtually provided no substantive services to either Mr. Cole or Mr. Frazier, he violated Rule 1.5(a) when he failed to refund these clients and, thus, charged an unreasonable fee.

The hearing judge concluded that Respondent also violated Rule 1.5(c) and (e). To the former, the hearing judge concluded that Respondent's admission in the CDA that he did not prepare written retainer agreements for various clients violated Rule 1.5(c). We agree. Rule 1.5(c) clearly requires that contingency fee arrangements be made in writing, bearing the signature of the client. Respondent admitted that, for clients with whom he had contingency arrangements, he had failed to secure their signature to any written agreement. This is an obvious violation of Rule 1.5(c).

For two other clients, Malik Smith and Ashley Johnson, the hearing judge concluded that Respondent impermissibly split fees with other attorneys without obtaining the express consent of those clients. The record shows this factually to be true and, thus, violative of Rule 1.5(e).

### F. Rule 1.8

Rule 1.8(e) states that

An attorney shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that:

(1) an attorney may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter; and

(2) an attorney representing an indigent client may pay court costs and expenses of litigation on behalf of the client.

45

The hearing judge concluded that Respondent violated Rule 1.8(e) when he advanced $3,000.00 to Ms. Barnes prior to receiving her settlement in November 2019. This was a violation of Rule 1.8(e). Respondent was not advancing court costs or expenses of litigation, and there is no evidence that Ms. Barnes was an indigent client. Thus, Respondent's advancement of settlement funds constituted financial assistance to a client, which Rule 1.8(e) prohibits.

## G. Rule 1.15

As relevant to this case, Rule 1.15 provides that

(a) An attorney shall hold property of clients or third persons that is in an attorney's possession in connection with a representation separate from the attorney's own property. Funds shall be kept in a separate account maintained pursuant to Title 19, Chapter 400 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that Chapter. Other property shall be identified specifically as such and appropriately safeguarded, and records of its receipt and distribution shall be created and maintained. Complete records of the account funds and of other property shall be kept by the attorney and shall be preserved for a period of at least five years after the date the record was created.

(b) An attorney may deposit the attorney's own funds in a client trust account only as permitted by Rule 19-408(b).

(c) Unless the client gives informed consent, confirmed in writing, to a different arrangement, an attorney shall deposit legal fees and expenses that have been paid in advance into a client trust account and may withdraw those funds for the attorney's own benefit only as fees are earned or expenses incurred.

An attorney violates Rule 1.15 when he or she either fails to deposit, without the client's informed consent, client funds into an attorney trust account or deposits client funds into a personal or operating account before those funds are earned. *Att'y Grievance*

*Comm'n v. Smith-Scott*, 469 Md. 281, 350 (2020) (citing *Planta*, 467 Md. at 352; and *Guida*, 391 Md. at 53). Respondent engaged in both and more. Respondent conceded to the hearing judge that he did not deposit funds received from Mr. Frazier or Mr. Cole into an attorney trust account, and the record does not show that Respondent had any other agreement in place with either client. This was a clear violation of Rule 1.15(c).

As previously mentioned, Respondent made personal expenditures from his client trust account. PayPal transactions for Uber Eats and a Showtime television subscription caused his account to overdraft. Such transactions violate Rule 1.15(a), which require that an attorney's own property be kept separately from clients' property.

At the hearing, Mr. Miller testified that Respondent withdrew fees from Respondent's attorney trust account for clients Mr. McCormick (May 22, 2020), Mr. Ayers (February 18, 2020), and L. Hodge (February 14, 2020), but the record does not reflect that Respondent then was holding funds for those clients. Thus, Respondent impermissibly used other clients' funds when he made those withdrawals, violating Rule 1.15.

The hearing judge also found that, from August 2019 to May 2020, Respondent did not deposit into his trust account client funds paid in advance and that he did not obtain informed consent from these clients before depositing them into his operating account. Respondent testified that his retainer agreements informed clients that Respondent would/could deposit these funds into his operating account, but he failed to produce at the hearing any signed retainer agreements to support that testimony.

Lastly, the hearing judge found that, throughout Petitioner's entire investigation, Respondent failed to keep accurate records of funds within his attorney trust account and

47

could not explain a variety of unknown transactions. Failure to keep accurate records and these additional transactions support a violation of Rule 1.15(a).

### H. Rule 1.16

> Upon termination of representation, an attorney shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of another attorney, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. The attorney may retain papers relating to the client to the extent permitted by other law.

Rule 1.16(d). "We have held that an attorney violates Rule 1.16(d) '[w]here a lawyer abandons a client without notice through the failure to take meaningful steps in pursuit of the client's interest . . . .'" *Kane*, 465 Md. 714–15 (alteration in original) (quoting *Att'y Grievance Comm'n v. Costanzo*, 432 Md. 233, 255 (2013)).

The hearing judge concluded that Respondent violated this rule with respect to Mr. Cole and Mr. Frazier for the reasons articulated for the violation of Rule 1.5. When Respondent charged Mr. Cole and Mr. Frazier and failed to provide any meaningful services, he indeed abandoned those clients without notice. From the beginning, Respondent never truly pursued those clients' interests, and that conduct constituted an improper termination of the attorney-client relationship. For these reasons, we agree with the hearing judge and likewise find that Respondent violated Rule 1.16(d).

### I. Rule 3.1

Rule 3.1 states that

> [a]n attorney shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes, for example, a good faith argument for an extension,

modification or reversal of existing law. An attorney may nevertheless so defend the proceeding as to require that every element of the moving party's case be established.

We have held that the filing of "frivolous motions" can constitute "a violation of Rule 3.1." *Att'y Grievance Comm'n v. Mixter*, 441 Md. 416, 471 (2015).

The hearing judge, citing *Mixter*, concluded that Respondent violated Rule 3.1 because "[t]hroughout the litigation and before various courts," he "failed to timely file motions and pleadings in accordance with the Maryland Rules." To support this conclusion, the hearing judge cited Respondent's untimely filing of: (1) a Counterclaim; (2) a December 20, 2019, Motion to Vacate the November 19th Judgment; (3) a March 23, 2020, Motion for Reconsideration of the Court's February 20th Order awarding attorney's fees against Respondent; (4) an October 22, 2020, Motion to Extend the Time to file Appellant's Memorandum; (5) a November 6, 2020, Appellate Memorandum; (6) a February 10, 2021, Amended Notice of Appeal of the Circuit Court's December 14, 2020, Order; (7) an April 6, 2021, Petition for Writ of Certiorari; and (8) an April 29, 2021, Opposition to Appellee's Motion to Dismiss Appeal. The hearing judge also cited Respondent's "numerous knowingly false Certificates of Service in the District Court of Maryland for Baltimore City, certifying that his filings were timely served on opposing counsel when he knew they were not."

We agree with the hearing judge. In *Mixter*, the hearing judge found that the attorney frivolously filed over 120 motions, classifying them into three different groups. 441 Md. at 510. For one group, the hearing judge predicated that finding on Mixter's "misrepresentation to the court" that the witnesses "had been properly served with a valid

49

subpoena." *Id.* In that hearing judge's view, Mixter "knowingly, intentionally and/or recklessly attached to the motions false evidence that the witnesses had been properly served in an attempt to mislead the court." *Id.* at 442–43. Regarding the second group of motions, the hearing judge concluded that they were frivolous because the courts in which they were filed had no jurisdiction over the nonparty witnesses"; Mixter "misled the various circuit courts by omitting the states of residence of the parties under compulsion, knowing that they were out-of-state witnesses, to avoid notifying the Maryland judges that additional protocols were required." *Id.* at 510. For the last group of motions, Mixter either "failed to make any good faith efforts to resolve the discovery disputes or the filings were filed prematurely or otherwise [did] not comply with the Maryland Rules." *Id.* at 511.

Respondent's pattern of submitting late filings in various courts, coupled with his intentionally misleading certificates of service in the District Court, qualify as a Rule 3.1 violation. This conduct is analogous to that in *Mixter*. The hearing judge concluded, and the record shows, that Respondent, in addition to habitually filing late pleadings or motions, "either failed entirely to provide opposing counsel with a service copy of the filing or provided a service copy days after certifying the filing had been provided." Like the attorney in *Mixter*, Respondent intentionally misled the court into believing that he properly effectuated service on opposing parties, knowing full well that his pleadings and other motions were defective for that reason. While Respondent certainly did not file as many motions as the attorney in *Mixter*, it is Respondent's overall conduct and untimely and deceptive practices that constitute a violation of Rule 3.1. Thus, we agree with the

50

hearing judge that this conduct violated Rule 3.1. *See id.* at 442–43.

## *J. Rule 3.3*

Attorneys must maintain candor towards all tribunals. Specifically:

(a) An attorney shall not knowingly:

(1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the attorney;

(2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client;

(3) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the attorney to be directly adverse to the position of the client and not disclosed by an opposing attorney; or

(4) offer evidence that the attorney knows to be false. If an attorney has offered material evidence and comes to know of its falsity, the attorney shall take reasonable remedial measures.

Rule 3.3(a). As one might expect, "an attorney violates Rule 3.3(a)(1) 'when he or she knowingly provides a court with false information.'" *Att'y Grievance Comm'n v. Cassilly*, 476 Md. 309, 354 (2021) (quoting *Att'y Grievance Comm'n v. Hoerauf*, 469 Md. 179, 211 (2020)). The hearing judge concluded that Respondent violated Rule 3.3(a) in the Frazier and Nelson Contracting matters. We agree.

Regarding the former, the hearing judge found that Respondent made numerous misrepresentations to the Court of Special Appeals. He knowingly and intentionally misrepresented to that court that his paralegal lost the flash drive containing an appellate brief for Mr. Frazier. Furthermore, Respondent stated that he only recently had contact with Mr. Frazier, never received any fees from Mr. Frazier, and that he (Respondent) was

51

scheduled to meet with a family member of Mr. Frazier; the meeting did not occur. The hearing judge determined these statements were false because Respondent failed to produce any evidence of an appellate brief, admitted that as of February 22, 2019, he had not communicated with Mr. Frazier since the March 8, 2017, hearing, and could not produce any evidence that a meeting ever took place. We agree with the hearing judge that Respondent's knowingly false statements to the intermediate appellate court constitute a violation of Rule 3.3(a).

Regarding the Nelson Contracting matter, Respondent admitted to the hearing judge that he was aware of the November 19, 2019, trial date; however, in his December 20, 2019, Motion to Vacate the Judgment, he represented to the District Court that neither he nor his client knew the trial date. That was a blatant and knowingly false misrepresentation to that court, constituting a separate violation of Rule 3.3(a). In addition, Respondent perpetually certified that his own filings were timely and that he timely served copies of various pleadings and motions on opposing counsel. In reality, these filings were untimely, and Respondent served opposing counsel either late or not at all. Such action also constitutes a violation of Rule 3.3(a).

### K. Rule 8.1

An applicant for admission or reinstatement to the bar, or an attorney in connection with a bar admission application or in connection with a disciplinary matter, shall not:

(a) knowingly make a false statement of material fact; or

(b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority,

except that this Rule does not require disclosure of information otherwise protected by Rule 19-301.6 (1.6).

Rule 8.1. "An attorney violates Rule 8.1(a) . . . when he or she knowingly makes a false statement of material fact in a disciplinary matter," *Hoerauf*, 469 Md. at 213 (citing *Att'y Grievance Comm'n v. Ambe*, 466 Md. 270, 296 (2019)); on the other hand, a violation of Rule 8.1(b) occurs when an attorney "fails to respond to Bar Counsel's lawful request for information[,]" *id.* (citing *Att'y Grievance Comm'n v. Edwards*, 462 Md. 642, 705 (2019)). The latter requires that an attorney "*timely* respond to a request from Bar Counsel . . . ." *Att'y Grievance Comm'n v. Rand*, 445 Md. 581, 638 (2015) (emphasis added) (citing *Att'y Grievance Comm'n v. Harmon*, 433 Md. 612, 628 (2013)).

The hearing judge concluded that Respondent violated Rule 8.1(a) in the Frazier matter and Rule 8.1(b) in the Hamilton, Crudup, Frazier, and Cole matters, and in the handling of his attorney trust account. For the reasons discussed below, we agree.

When responding to Mr. Frazier's complaint, Respondent stated to Petitioner that he represented Mr. Frazier in front of Judge Peters in the circuit court and that he never was paid for his services. Respondent's statement knowingly was false. The record shows that Respondent was compensated $4,000.00 to represent Mr. Frazier in connection with a Writ of Actual Innocence. While Respondent did attend the hearing for this matter, he failed to prepare himself or Mr. Frazier and failed to notify Mr. Frazier that: the Writ was denied, an appeal was noted, and the appeal was dismissed. Even after Mr. Frazier requested a refund, Respondent never responded to Mr. Frazier. Furthermore, Respondent knowingly made a false statement when he told Petitioner that he informed Mr. Johnson to

53

contact the OPD to assist with the appeal. At trial, Respondent testified, however, that he told Mr. Johnson about the OPD only *after* the Court of Special Appeals dismissed the appeal. These knowingly false statements to Petitioner in connection with their disciplinary investigation constitute violations of Rule 8.1(a).

Moving to the remaining matters, we agree that Respondent violated Rule 8.1(b). In all other specified matters, Respondent continually failed to respond timely to Petitioner's requests for information or documents (client files, retainer agreements, bank statements, deposit slips, cancelled checks, client ledgers, etc.). Respondent repeatedly ignored Petitioner's lawful requests for information and documents, and such action is a quintessential example of a Rule 8.1(b) violation.

### L. Rule 8.4

In pertinent part,

[i]t is professional misconduct for an attorney to:

(a) violate or attempt to violate the Maryland Attorneys' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

\* \* \*

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; [or]

(d) engage in conduct that is prejudicial to the administration of justice[.]

Rule 8.4. Plainly and simply, an attorney violates "Rule 8.4(a) when he or she violates other Rules of Professional Conduct." *Att'y Grievance Comm'n v. Powers*, 454 Md. 79, 107 (2017). By virtue of Respondent's other sustained violations herein, we agree with the hearing judge that Respondent also violated Rule 8.4(a).

54

We have held that "Rule 8.4(c) . . . encompasses a 'broad universe of misbehavior.'" *Att'y Grievance Comm'n v. Johnson*, 472 Md. 491, 541 (2021) (quoting *Att'y Grievance Comm'n v. McDonald*, 437 Md. 1, 39 (2014)). Simply by "knowingly making a false statement, an attorney 'necessarily engages in conduct involving misrepresentation.'" *Att'y Grievance Comm'n v. Young*, 473 Md. 94, 124 (2021) (quoting *Att'y Grievance Comm'n v. Steinhorn*, 462 Md. 184, 198 (2018)). The hearing judge noted three instances where Respondent violated Rule 8.4(c): his knowing and intentional misrepresentation to the Court of Special Appeals and to Petitioner (previously addressed above) and his knowingly false representation to the District Court that neither he nor his client were aware of the November 19, 2019, trial date. We previously have addressed this conduct in our analysis for Rule 3.3, and we note the significant overlap between Rules 3.3(a) and 8.4(c), recognizing that a violation of the former generally entails a violation of the latter. *See Cassilly*, 476 Md. at 399. Thus, we agree with the hearing judge and likewise conclude that Respondent violated Rule 8.4(c) in these instances.

Turning to Rule 8.4(d), the hearing judge concluded that Respondent violated this Rule in all specified client matters, as well as in the handling of his client trust account. Rule 8.4(d) prohibits "conduct that is prejudicial to the administration of justice." "Conduct is prejudicial to the administration of justice when it 'reflects negatively on the legal profession and sets a bad example for the public at large' or is 'likely to impair public confidence in the profession, impact the image of the legal profession and engender disrespect for the court[.]'" *Att'y Grievance Comm'n v. Daley*, 476 Md. 283, 305 (2021) (alteration in original) (first quoting *Att'y Grievance Comm'n v. Goff*, 399 Md. 1, 22

55

(2007); then quoting *Att'y Grievance Comm'n v. Agbaje*, 438 Md. 695, 717 (2014)).  In

concluding that Respondent's conduct violated Rule 8.4(d), the hearing judge noted that

he

> failed to file necessary filings before numerous courts; failed to appear for
> trial; failed to adequately communicate with his clients; made knowing and
> intentional misrepresentations to various courts to cover up his misconduct;
> engaged in a pattern of filing frivolous and untimely motions; and grossly
> mishandled his attorney trust account, including routinely failing to deposit
> unearned funds in trust.

All this conduct certainly reflects negatively on the legal profession, impairs public

confidence in the legal system, and engenders disrespect for the various courts throughout

the State.  We, therefore, concur that this conduct is violative of Rule 8.4(d).

### *M. Rule 19-407*

Rule 19-407(a) provides that

[t]he following records shall be created and maintained for the receipt and
disbursement of funds of clients or of third persons:

(1) *Attorney Trust Account Identification.*  An identification of all attorney
trust accounts maintained, including the name of the financial institution,
account number, account name, date the account was opened, date the
account was closed, and an agreement with the financial institution
establishing each account and its interest-bearing nature.

(2) *Deposits and Disbursements.*  A record for each account that
chronologically shows all deposits and disbursements, as follows:

(A) for each deposit, a record made at or near the time of the deposit that
shows (i) the date of the deposit, (ii) the amount, (iii) the identity of the client
or third person for whom the funds were deposited, and (iv) the purpose of
the deposit;

(B) for each disbursement, including a disbursement made by electronic
transfer, a record made at or near the time of disbursement that shows (i) the
date of the disbursement, (ii) the amount, (iii) the payee, (iv) the identity of

the client or third person for whom the disbursement was made (if not the payee), and (v) the purpose of the disbursement;

(C) for each disbursement made by electronic transfer, a written memorandum authorizing the transaction and identifying the attorney responsible for the transaction.

(3) *Client Matter Records.* A record for each client matter in which the attorney receives funds in trust, as follows:

(A) for each attorney trust account transaction, a record that shows (i) the date of the deposit or disbursement; (ii) the amount of the deposit or disbursement; (iii) the purpose for which the funds are intended; (iv) for a disbursement, the payee and the check number or other payment identification; and (v) the balance of funds remaining in the account in connection with the matter; and

(B) an identification of the person to whom the unused portion of a fee or expense deposit is to be returned whenever it is to be returned to a person other than the client.

(4) *Record of Funds of the Attorney.* A record that identifies the funds of the attorney held in each attorney trust account as permitted by Rule 19-408(b).

As violations of this Rule, the hearing judge cited Respondent's admission in the CDA that he failed to maintain client ledgers or an electronic transfer log, or perform monthly reconciliations. Respondent openly admitted that he did not comply with Rule 19-407's requirements by failing to create and maintain the necessary records specified therein. We, thus, agree with the hearing judge that he committed a violation of Rule 19-407(a) with respect to the handling of his client trust account.

### N. Rule 19-410

In pertinent part, Rule 19-410 states:

(b) No Cash Disbursements. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer, and no cash withdrawal may be made from an automated teller machine or by any other

method. All disbursements from an attorney trust account shall be made by check or electronic transfer.

(c) Negative Balance Prohibited. No funds from an attorney trust account shall be disbursed if the disbursement would create a negative balance with regard to an individual client matter or all client matters in the aggregate.

As previously mentioned, Mr. Miller testified at the hearing regarding various transactions from Respondent's attorney trust account. Mr. Miller identified no less than five cash withdrawals ranging from $18.00 to $1,000.00. Some of these transactions were associated with specific clients, but Mr. Miller was unable to identify a client in connection with two of these withdrawals. Regardless of whether Respondent made these cash withdrawals to pay himself or to pay a client, the mere fact that he made *any* cash withdrawal is a violation of the Rule. *See Att'y Grievance Comm'n v. Frank*, 470 Md. 699, 740 (2020) ("Respondent violated Maryland Rule 19-410(b) when he issued a $900.00 check payable to cash. Although Respondent may have issued this check for [a client] and delivered the cash to her, the action of issuing a check payable to cash violates Maryland Rule 19-410(b)."). We agree with the hearing judge that Respondent's cash withdrawals violated Rule 19-410(b).

The hearing judge also concluded that Respondent violated Rule 19-410(c) when he maintained from August 2019 through May 2020 a negative balance in his trust account. This violation is straightforward. For that period of time, the record shows that Respondent's attorney trust account was overdrawn. That fact alone constitutes a violation of Rule 19-410(c), and we agree with the hearing judge.

58

## VI. AGGRAVATING AND MITIGATING FACTORS

In every attorney disciplinary proceeding, we consider whether any aggravating and/or mitigating factors are present. Aggravating factors consist of

> (1) prior attorney discipline; (2) a dishonest or selfish motive; (3) a pattern of misconduct; (4) multiple violations of the M[A]RPC; (5) bad faith obstruction of the attorney discipline proceeding by intentionally failing to comply with the Maryland Rules or orders of this Court [ ]; (6) submission of false evidence, false statements, or other deceptive practices during the attorney discipline proceeding; (7) a refusal to acknowledge the misconduct's wrongful nature; (8) the victim's vulnerability; (9) substantial experience in the practice of law; (10) indifference to making restitution or rectifying the misconduct's consequences; (11) illegal conduct, including that involving the use of controlled substances; and (12) likelihood of repetition of the misconduct.

*Att'y Grievance Comm'n v. Keating*, 471 Md. 614, 639 (2020) (quoting *Att'y Grievance Comm'n v. Shuler*, 443 Md. 494, 506–07 (2015)). We consider the following mitigating factors:

> [A]bsence of a prior disciplinary record; absence of a dishonest or selfish motive; personal or emotional problems; timely good faith efforts to make restitution or to rectify consequences of misconduct; full and free disclosure to disciplinary board or cooperative attitude toward proceedings; inexperience in the practice of law; character or reputation; physical or mental disability or impairment; delay in disciplinary proceedings; interim rehabilitation; imposition of other penalties or sanctions; remorse; and finally, remoteness of prior offenses.

*Id.* at 639–40 (quoting *Att'y Grievance Comm'n v. Hodes*, 441 Md. 136, 209 (2014)).

Petitioner must establish aggravating factors by clear and convincing evidence; Respondent, on the other hand, must prove any mitigating factor by only a preponderance of the evidence. *Karambelas*, 473 Md. at 171 (citing *Edwards*, 462 Md. at 708; and *Att'y Grievance Comm'n v. Joseph*, 422 Md. 670, 695 (2011)).

59

The hearing judge found as aggravating factors that Respondent: (1) committed multiple violations of the MARPC; (2) failed to acknowledge the wrongful nature of his conduct (by blaming others for his actions); (3) failed to participate in the ordered trust account classes; (4) engaged in a continuous pattern of neglect across the Cole, Crudup, Frazier, Hamilton, and Nelson Contracting matters; (5) continuously mismanaged his attorney trust account even after entering into the CDA; and (6) presented, on more than one occasion, with a disrespectful tone when responding to Assistant Bar Counsel. The hearing judge found that Respondent proved as mitigating factors his: lack of a prior disciplinary record, inexperience in the practice of law, and character and reputation (as demonstrated by Respondent's participation in various pro bono events and character witnesses who testified on his behalf).

## A. *Aggravating Factors*

We recognize that not all the conduct cited by the hearing judge qualifies as an aggravating factor. For example, Respondent's poor decorum when responding to Bar Counsel—while unbecoming—is not conduct that falls under any aggravating factor that this Court recognizes. *See Keating*, 471 Md. at 639. The remainder of conduct cited by the hearing judge squarely is encompassed by three aggravating factors: multiple MARPC violations, Respondent's refusal to acknowledge the misconduct's wrongful nature, and the likelihood that he would repeat his misconduct.

As discussed herein, Respondent violated 12 MARPC and mismanaged client funds. He continually and intentionally fell short of the ethical standards by which all Maryland attorneys are expected to abide. Because of the numerous violations, we agree that this

aggravating factor exists by clear and convincing evidence.

We likewise agree with the hearing judge that Respondent refused to acknowledge the wrongful nature of his misconduct. Observing Respondent's testimony, the hearing judge noted that Respondent was not credible and failed to acknowledge his misconduct. Respondent testified that his paralegal lost a thumb drive, which, he avers, contained Mr. Frazier's appellate brief. Regarding the Nelson Contracting matter, Respondent testified multiple times that he believed his motions were timely and that the judge who ruled on those motions simply was incorrect. Lastly, Respondent blamed Petitioner for his inability to participate in the agreed-upon trust account classes.

The hearing judge flatly rejected all of Respondent's testimony. It is well-established that, in any given case, "the trier of fact decides which evidence to accept and which to reject." *Jones v. State*, 343 Md. 448, 460 (1996). We afford great deference to these determinations "because it is the trier of fact, and not the appellate court, that possesses a better opportunity to view the evidence presented first-hand, including the demeanor-based evidence of the witnesses, which weighs on their credibility." *State v. Manion*, 442 Md. 419, 431 (2015) (citing *Walker v. State*, 432 Md. 587, 614 (2013)). The hearing judge clearly articulated that Respondent lacked credibility based on the hearing judge's observations and Petitioner's inability to corroborate any of his own testimony, concluding that Respondent did not acknowledge the wrongfulness of his misconduct. Because the record clearly demonstrates that Respondent blamed others for his wrongdoing, and because we afford great deference to the hearing judge's credibility determinations, Respondent's refusal to acknowledge his misconduct's wrongful nature is

an aggravating factor.

Lastly, the record clearly supports the conclusion that Respondent likely would repeat his misconduct. He failed to attend the agreed-upon trust account classes specified in the CDA. This demonstrates that learning from past mistakes and improving future professional conduct was not something in which Respondent was interested. Furthermore, even after he entered into the CDA (September 9, 2019), he continued to engage in gross mismanagement of client funds. For example, in November 2019, two personal transactions caused an overdraft of his client trust account. He additionally engaged in commingling personal and client funds and was unable to account for advanced funds paid by various clients. Respondent has demonstrated a clear disregard for the seriousness of his actions by perpetually engaging in the mismanagement of client funds even after he was offered the chance by Petitioner to take courses aimed at rectifying his deficient conduct. Respondent deliberately chose not to cure those deficiencies and, instead, engaged in further misconduct. Thus, we sustain the hearing judge's conclusion that Respondent's likelihood of repeating his misconduct is an aggravating factor.

### B. Mitigating Factors

For the reasons discussed below, we likewise conclude that Respondent has shown by a preponderance of the evidence the mitigating factors found by the hearing judge. *See Karambelas*, 473 Md. at 171.

Prior to Petitioner's involvement in these five client matters, Respondent had no attorney disciplinary matters brought against him. Thus, that mitigating factor is established.

Respondent also has limited experience in the practice of law. He was admitted to the Bar of this Court on June 16, 2015. He began representing Mr. Cole and Mr. Frazier in December 2016—a mere 18 months after he was licensed to practice law in Maryland. Representation in the Crudup and Hamilton matters began in May and September of 2017, respectively, and Respondent began representing Nelson Contracting in March 2019. All told, Respondent began representing most of these clients within 27 months of becoming licensed. Thus, this Court is satisfied that Respondent has proved by a preponderance of the evidence that his inexperience in the practice of law is a mitigating factor. *See id.*; *Keating*, 471 Md. at 639–40.

At the hearing, Respondent called Russell Neverdon and Marvin Hicks to testify on Respondent's behalf. He additionally offered into evidence exhibits corroborating those witnesses' testimony.

Mr. Neverdon testified that he first met Respondent when Respondent established his office at 2225 St. Paul Street—a location whose intended purpose, according to Mr. Neverdon, was to provide young African American attorneys an opportunity to establish their practices. He further testified that Respondent became involved with Out for Justice, an organization that conducted expungement workshops and offered re-entry services. Between all sources,[25] Mr. Neverdon surmised that Respondent engaged in about one

---

[25] Respondent also engaged in (1) Books and Cooks, a community event where he would help serve food; (2) Surviving the Encounter, a lecture series where he informed African American youth how to respond and interact during police encounters; and (3) informal talks with elderly members from a neighboring church, regarding estate planning, advance healthcare directives, etc.

community event per month. According to Mr. Neverdon, the community gravitated towards Respondent, who was willing to participate, never cancelled once he committed, and would cover for other attorneys who were unable to attend the events.

Mr. Hicks met Respondent when Respondent was a freshman at Morgan State University in 2004.[26] Mr. Hicks served as a mentor to Respondent through their mutual fraternity, and he testified that Respondent, after passing the bar, remained active in both their fraternity and community at large. Mr. Hicks praised Respondent for staying involved in the community. Mr. Hicks testified that Respondent is "like a son," and indicated his willingness to support Respondent in any way he could.

Considering this evidence, we likewise agree that Respondent established by a preponderance of the evidence a positive reputation within his community.

## VII. THE SANCTION

Petitioner recommends that we disbar Respondent. At oral argument, counsel for Respondent asked for an indefinite suspension of not less than one year. As we will explain, disbarment is the appropriate sanction.

### A. Generally

The purpose of sanctions in attorney disciplinary proceedings is not to be retributive. *See Keating*, 471 Md. at 651 ("It is well-established that the purpose of sanctions in attorney disciplinary proceedings is not to punish the attorney."). Rather, this Court must

---

[26] At the time of the hearing, Mr. Hicks was employed by Morgan State University as its Operating Budget Director.

promote both general and specific deterrence and safeguard the public and its confidence in the legal profession. *Att'y Grievance Comm'n v. Bonner*, 477 Md. 576, 607 (2022).

"In determining an appropriate sanction for a lawyer's misconduct, this Court considers: (1) the [MARPC] that the lawyer violated; (2) the lawyer's mental state; (3) the injury that the lawyer's misconduct caused or could have caused; and (4) aggravating factors and/or mitigating factors." *Att'y Grievance Comm'n v. Slate*, 457 Md. 610, 646 (2018) (quoting *Att'y Grievance Comm'n v. Allenbaugh*, 450 Md. 250, 277 (2016)).

### *B. Collins: Our Clarification of the Vanderlinde Standard*

Until recently, this Court relied on *Attorney Grievance Commission v. Vanderlinde* for determining the appropriate sanction in attorney grievance cases involving intentional dishonesty. 364 Md. 376, 413 (2001). That case instructed that disbarment was the appropriate sanction for intentional dishonest conduct absent compelling extenuating circumstances. *Id.* In *Collins*, we noted, however, "an increasing number of cases involving intentional dishonesty in which we have not imposed the sanction of disbarment." 477 Md. at 518. After discussing in detail those cases,[27] we recognized that "our holding in Vanderlinde no longer exclusively sets the standard for imposition of the sanction in cases involving intentional dishonesty." *Id.* at 529. Instead, our post-

---

[27] In *Collins*, 477 Md. at 518–29, we discussed: *Attorney Grievance Commission v. Johnson*, 472 Md. 491 (2021); *Attorney Grievance Commission v. Keating*, 471 Md. 614 (2020); *Attorney Grievance Commission v. Riely*, 471 Md. 458 (2020); *Attorney Grievance Commission v. Singh*, 464 Md. 645 (2019); *Attorney Grievance Commission v. Steinhorn*, 462 Md. 184 (2018); *Attorney Grievance Commission v. Sperling*, 459 Md. 194 (2018); *Attorney Grievance Commission v. Hecht*, 459 Md. 133 (2018); *Attorney Grievance Commission v. Shapiro*, 441 Md. 367 (2015); and *Attorney Grievance Commission v. Sperling*, 432 Md. 471 (2013).

*Vanderlinde* cases reveal that, in some instances, "we have not imposed the sanction of disbarment where the dishonest conduct at issue does not involve theft, fraud, harm to a client or third party, or the intentional misappropriation of funds." *Id.* at 530. For cases involving purely dishonest conduct, we individually assess each case to determine whether *Vanderlinde* still applies, *i.e.*, whether compelling, extenuating circumstances that are the root cause of the misconduct are required to warrant a sanction less than disbarment. *Id.*

### C. Sanction in This Case

We agree with Petitioner that the appropriate sanction for Respondent's misconduct is disbarment. We first note that Respondent's misappropriation of funds and harm inflicted upon his clients places his case outside our holding in *Collins*. *See id.* Respondent urges this Court to consider *Collins* in support of a sanction less than disbarment, but the conduct in *Collins*, which we sanctioned with an indefinite suspension, *id.*, is much less severe than Respondent's. Collins falsely advised this Court and Petitioner that she never received a complaint from Petitioner, and the complaint itself stemmed from her intentional misrepresentation to an opposing party in a child custody matter.[28] *Id.* at 530–31. Collins did not injure any party, nor did her conduct involve any monetary theft or mismanagement. *Id.* at 531. She also made false statements to this Court when she filed a petition for reinstatement, but we again highlighted that this conduct involved no harm to clients or other "pecuniary benefit to Collins." *Id.* at 533. There is no doubt that

---

[28] Collins called Irving, the other parent of her client's children, and impersonated a school employee, which prompted Irving to divulge personal information. *Collins*, 477 Md. at 488–89.

Collins's conduct was "as perplexing and inexplicable as it was dishonest," but we could not in good faith sanction her with disbarment given the "recent case law in which we have not consistently imposed the sanction of disbarment for misconduct involving [only] intentional dishonesty . . . ." *Id.* at 531, 533.

Finding that *Collins* is not applicable to Respondent's case, we further note that it did nothing to change our longstanding recognition that an attorney's "misappropriation of client funds . . . in and of itself warrants disbarment." *Karambelas*, 473 Md. at 177 (citing *Att'y Grievance Comm'n v. Sullivan*, 369 Md. 650, 655–56 (2002)); *see, e.g.*, *Bonner*, 477 Md. at 582 ("[O]ur case law . . . generally imposes the sanction of disbarment where an attorney's misconduct involves theft or intentional misappropriation of funds.").

But even setting aside our practice of customary disbarment when an attorney misappropriates client funds, *see Karambelas*, 473 Md. at 177, our weighing of the necessary factors confirms that disbarment is the appropriate outcome. *See Slate*, 457 Md. at 646. Respondent's case is *severe*. He violated 12 rules of professional conduct with numerous clients and two Maryland Rules concerning attorney trust accounts. There is no evidence indicating that he lacked a sound mental state preventing him from rendering legal services in accordance with the MARPC. His clients greatly suffered, and their injuries run the gambit: monetary loss without bargained-for services, adverse court judgments, the loss of the right to appeal, and, potentially, continued loss of liberty. While Respondent's lack of prior disciplinary proceedings, limited experience in the practice of law, and evidence of good character/reputation play some mitigating role, those mitigating factors cannot overcome Respondent's conduct, especially when it is aggravated by

67

multiple rule violations, a refusal to acknowledge his misconduct's wrongful nature, and the likelihood that he would repeat his misconduct.

To safeguard the public from future harm and to protect its perception of the legal community at large, we concluded that disbarment was the appropriate sanction for Respondent's flagrant and persistent MARPC violations. *See Bonner*, 477 Md. at 607; *Karambelas*, 473 Md. at 177.

For these reasons, we issued on June 6, 2022, our *per curiam* Order disbarring Respondent.